2 to cv

RB10/

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMMI D. WRIGHT                    :
                                   :    No. 1:CV-00-1657
            Plaintiff,             :
                                   :    (Judge Conner)
            v.                     :
                                   :
BEULAH HADRICK,                    :
CHARLEEN SZABO, SCOTT              :
SHREVE and RAY KENT,               :
                                   :
            Defendants.            :

FILED
HARRISBURG, PA

SEP 2 7 2002

_____ D. ANDREA, CLER

**EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT
ON THE PLEADINGS OR FOR SUMMARY JUDGMENT**

THOMAS A. MARINO
United States Attorney

MARY CATHERINE FRYE
Assistant U.S. Attorney
228 Walnut Street
Harrisburg, PA  17108
(717) 221-4482
Attorneys for Defendants

☆U.S. GOVERNMENT PRINTING OFFICE: 1999-452-1

OMB NO. 3



# U.S. MERIT SYSTEMS PROTECTION BOARD

## APPEAL FORM

### INSTRUCTIONS

**GENERAL:** You do not have to use this form to file an appeal with the Board. However, if you do not, your appeal must still comply with the Board's regulations. 5 C.F.R. Parts 1201 and 1209. Your agency's personnel office will give you access to the regulations, and the Board will expect you to be familiar with them. You also should become familiar with the Board's key case law and controlling court decisions as they may affect your case. **You must tell the Board if you are raising an affirmative defense (see Part IV), and you are responsible for proving each defense you raise.**

**WHERE TO FILE AN APPEAL:** You must file your appeal with the Board's regional or field office which has responsibility for the geographic area in which you are employed. See 5 C.F.R. Part 1201, Appendix II.

**WHEN TO FILE AN APPEAL:** Your appeal must be filed during the period beginning with the day after the effective date of the action you are appealing and ending on the 30th day after the effective date. You may not file your appeal before the effective date of the action you are appealing. If you are appealing from a decision which does not set an effective date, you must file within 35 days of the date of the decision you are appealing. If your appeal is late, it may be dismissed as untimely. The date of the filing is the

date your appeal is postmarked, the date of the facsimile transmission, the date it is delivered to a commercial overnight delivery service, or the date of receipt if you personally deliver it to regional or field office.

**HOW TO FILE AN APPEAL:** You may file your appeal by m by facsimile, by commercial overnight delivery, or by person delivery. You must submit two copies of both your appeal and attachments. You may supplement your response to any question separate sheets of paper, but if you do, please put your name address at the top of each additional page. All of your submiss must be legible and on 8 1/2" x 11" paper. Your appeal m contain your or your representative's signature in block 6. does not, your appeal will be rejected and returned to you your representative signs block 6, you must sign block 1 submit a separate written designation of representative.

**WHISTLEBLOWING APPEAL/STAY REQUEST:** If you lieve the action you are appealing was threatened, proposed, tal or not taken because of whistleblowing activities, you must co plete Part VII of this form. If you are requesting a stay, you m complete Part VIII of this form.

*Privacy Act Statement: This form requests personal information which is relevant and necessary to reach a decision in your appeal. The U.S. Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Since your appeal is a voluntary action you are not required to provide any personal information in connection with it. However, failure to supply the U.S. Merit Systems Protection Board with all the information essential to reach a decision in your case could result in the rejection of your appeal.*

*The U.S. Merit Systems Protection Boar sions of Executive Order 9397, dated Nove Social Security number, but providing yo voluntary and failure to provide it will not appeal. Your Social Security number will purposes in the processing of your appeal.*

*You should know that the decisions of th*

*tion Board on appeals are final administrative decisions and, as such available to the public under the provisions of the Freedom of Informa Act. Additionally, it is possible that information contained in your ap file may be released as required by the Freedom of Information Act. information about your appeal will also be used in depersonalized for a data base for program statistics.*

*Public Reporting Burden: The public reporting burden for collection of information is estimated to vary from 20 minutes to 1 h ... an average of 30 minutes per response, including time for revi ...ting data sources, gathering the data necess ...ewing the collection of information. Send ...ten estimate or any other aspect of the colle ...g suggestions for reducing this burden, to Resource Management Services, Merit Sys Vermont Ave., NW., Washington, DC 20419*

Agency Exhibit "B"

### Part I Appellant Identification

HAND DELIVERED

1. Name *(last, first, middle initial)*
Wright Sammi

2. Social Security Number
92-44-9193

3. Present address *(number and street, city, state, and ZIP code)* You must notify the Board of any change of address or telephone number while the appeal is pending with the MSPB.
716 North 23rd Street
Allentown PA 18104

4. Home phone *(include area code)*
610-838-5849

5. Office phone *(include area code)*
610 751-3170

6. I certify that all of the statements made in this appeal are true, complete, and correct to the best of my knowledge and belief.

Signature of appellant or designated representative   Date signed
Sammi D. Wright 1/31

## Part II Designation of Representative

represent yourself in this appeal, or you may choose someone to represent you. Your representative does not have to attorney. You may change your designation of a representative at a later date, if you so desire, but you must notify the ... promptly of any change. Where circumstances require, a separate designation of representative may be submitted after the original filing. Include the information requested in blocks 7 through 11.

"I hereby designate _Donald Bailey_ to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. I understand that any limitation on this settlement authority must be filed in writing with the Board."

| 8. Representative's address *(number and street, city, state, and ZIP code).* | 9. Representative's employer |
|---|---|
| | _Self_ |
| | 10.a) Representative's telephone number *(include area code)* |
| _4311 North 6th St._ | _717-221-9500_ |
| _Harrisburg PA 17110_ | 10.b) Representative's facsimile number |
| | 11. Appellant's signature          Date |
| | _James D. Wright_   _1/31/01_ |

## Part III Appealed Action

12. Briefly describe the **agency action** you wish to appeal and attach the proposal letter and decision letter. If you are appealing a decision relating to the denial of retirement benefits, attach a copy of OPM's **reconsideration decision.** If the relevant SF-50 or its equivalent is available, send it now; however, do NOT delay filing your appeal because of it. You may submit the SF-50 when it becomes available. Later in the proceeding, you will be afforded an opportunity to submit detailed evidence in support of your appeal.

_See attached_

| 13. Name and address of the agency that took the action you are appealing *(including bureau or other divisions, as well as street address, city, state and ZIP code)* | 14. Your position title and duty station at the time of the action appealed |
|---|---|
| _See attached_ | _See attached_ |

| 15. Grade at time of the action appealed | 16. Salary at the time of the action appealed | 17. Are you a veteran and/or entitled to the employment rights of a veteran? |
|---|---|---|
| _GS 11_ | $ _52,000_ per _year_ | ☑ Yes      ☐ No |

| 18. Employment status at the time of the action appealed | 19. If retired, date of retirement *(month, day, year)* | 20. Type of service |
|---|---|---|
| ☐ Temporary   ☐ Applicant   ☐ Retired<br>☑ Permanent   ☐ Term   ☐ Seasonal | _NA_ | ☑ Competitive   ☐ SES<br>☐ Excepted   ☐ Postal Service<br>☐ Foreign Service |

| 21. Length of government service | 22. Length of service with acting agency | 23. Were you serving a probationary or trial period at the time of the action appealed? |
|---|---|---|
| _18 years 4 months_ | _5 years_ | ☐ Yes   ☑ No |

| 24. Date you received written notice of the proposed action *(month, day, year) (attach a copy)* | 25. Date you received the final decision notice *(month, day, year) (attach a copy)* | 26. Effective date of the action appealed *(month, day, year)* |
|---|---|---|
| _12/21/00_ | _1/8/01_ | _1/26/01_ |

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
NORTHEASTERN REGIONAL OFFICE

SAMMI D. WRIGHT                    :    DOCKET NUMBER
     Appellant                    :    PH-0752-01-0138-I-1
                             :
     v.                          :
                             :
DEPARTMENT OF VETERANS AFFAIRS:
     Agency                      :

## SETTLEMENT AGREEMENT

     The parties to this Settlement Agreement, Mrs. Sammi D. Wright (Appellant), and the Department of Veterans Affairs Medical Center, Lebanon, PA (Agency), hereby agree to the following terms and conditions as full settlement of the above captioned matter.  The parties agree to the following provisions:

1.  Appellant agrees that her appeal to the Merit Systems Protection Board, designated, as Sammi D. Wright v. Department of Veterans Affairs, Docket Number PH-0752-01-0138-I-2, be withdrawn with prejudice.

2.  The Agency agrees to mitigate and rescind its January 8, 2001 termination decision that was effective January 26, 2001 with restoration of full back pay, interest and benefits retroactive to January 26, 2001 with reinstatement to the ~~Mental Health & Behavior Sciences~~ Product Line ~~with a suspension of 45 days,~~ as a Social Worker, G-S-11 ~~at the option of the Agency,~~ effective September 10, 2001

3.  The Agency will expunge from the Appellant's Official Personnel File (OPF) and any other Personnel Records, all statements and charges related to the January 8, 2001 termination action.

4.  The Agency agrees to pay Appellant's self-paid or unpaid expenses, to the extent that these bills are submitted to and not paid by Appellant's health insurance program related to claim related bills.

5.  The parties agree that Compensatory Damages, if any, pecuniary and non-pecuniary, for this Complaint are hereby deferred until settlement of all claims and disputes between the parties can be affected in other Forums.

*Back pay & benefits as soon as possible but not later than Sixty (60) day from the date of this Agreement.*
*The Appellant agrees to a Forty-Five (45) Day suspension beginning January 27, 2001.*

6. This Settlement shall not serve as a precedent for resolving any other complaints, which have been or may be filed by the Appellant or any other person.

7. The Agency agrees to abide by its obligations under law, not to discriminate or retaliate against the Complainant for any reason.

8. The fact that this Settlement Agreement has been entered into by the Agency does not constitute an admission by the Agency as to the truth of any matter set forth in the above-identified matters nor does it constitute an admission of liability, fault or error on the part of the United States, the Agency, its Representative and Employees.

9. The parties offer this Settlement Agreement into the record. The MSPB shall retain jurisdiction over its enforcement.

10. The parties further agree that this Settlement Agreement constitutes the entire agreement and that no other terms to this Agreement exist except those specified herein.

11. The Parties understand the terms of the Settlement Agreement.

12. The Parties voluntarily enter into the Settlement Agreement.

13. The Appellant admits to no wrongdoing by entering into this Agreement.

_____
Sammi D. Wright
Appellant

Date  8/30/01


_____
Dr. Charleen Szabo
Chief Executive Officer

Date  8-30-01


_____
William F. Livingston, Esquire
Agency Counsel

Date  8-30-01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMMI D. WRIGHT,
             PLAINTIFF     :
                            :
                            :
       VS                  :   NO.  1:CV-00-1657
                            :
BEULAH HADRICK, CHARLEEN SZABO,  :
SCOTT SHREVE AND RAY KENT,     :
            DEFENDANTS     :

          VIDEO
          DEPOSITION OF:  SAMMI D. WRIGHT

          TAKEN BY:       DEFENDANTS

          BEFORE:        KAREN L. BLOUCH, RMR
                         NOTARY PUBLIC

                         P.R. VIDEO, INC.
                         ANTHONY MARCECA,
                         VIDEOGRAPHER

          DATE:          JULY 9, 2002, 1:19 P.M.

          PLACE:        UNITED STATES ATTORNEY'S OFFICE
                         228 WALNUT STREET
                         HARRISBURG, PENNSYLVANIA


APPEARANCES:

      LAW OFFICES OF DON BAILEY
      BY:  DON BAILEY, ESQUIRE

          FOR - PLAINTIFF

      OFFICE OF THE UNITED STATES ATTORNEY
      BY:  MARY CATHERINE FRYE, ASSISTANT U.S. ATTORNEY

          FOR - DEFENDANTS

ALSO PRESENT:

      RAY KENT
      CHARLEEN SZABO

2

```
1                         INDEX

2                        WITNESS

3    WITNESS           DIRECT    CROSS    REDIRECT    RECROSS

4    Sammi D. Wright     3        48        73          76
                                            79
5

6                        EXHIBITS

7    DEFENDANTS' EXHIBIT NO.                MARKED

8    1 - Letter dated April 25, 2000         19

9    2 - Letter dated April 8, 2000          34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

11

1    social work.

2        Q        In your complaint, you claim that your First
3    Amendment right to freedom of speech was violated.  Can you
4    tell me what Ray Kent did to violate your First Amendment
5    rights?

6        A        What Ray Kent did to violate my rights.

7        Q        Let me take you to specific -- okay, if you
8    look at Page 5, and you look at Paragraphs 29 and 30, you
9    allege plaintiff also believes and avers that the
10   harassment she was and is receiving was exacerbated
11   unlawfully in violation of her 14th Amendment rights
12   because she sent information to Senator Arlen Specter.

13               Paragraph 30, the defendants have violated
14   her rights to be free of unlawful interference with her
15   right to contract and of her rights to free speech.

16               So what I am asking you is, specific -- with
17   specific reference to those paragraphs, how did Ray Kent
18   violate your right to free speech?  What did he do that
19   you're complaining about?

20       A        What happened was I wrote a letter to
21   Senator Specter after my pay was docked.  And I didn't
22   learn of it for like two weeks later.  At that point,
23   that's when I contacted Arlen Specter.

24       Q        In what way --

25       A        And I related concerns I had regarding the

12

```
 1   services and veterans and also the fact that I had been
 2   docked.
 3        Q        What --
 4        A        From my pay.
 5                 MR. BAILEY:  I don't think she's done.  The
 6   question was what he did to her.
 7                 MS. FRYE:  I'm going to ask it again.
 8                 MR. BAILEY:  Let her respond.  You
 9   interrupt -- go ahead.
10   BY MS. FRYE:
11        Q        Are you done?
12        A        No, I wasn't done, but.
13        Q        Go ahead then.
14        A        As I say, my pay was docked, eight hours of
15   pay was docked from me.  And I didn't learn of it for like
16   two weeks later, that it had been done.  And at that point,
17   that was when I got the document, necessary documents
18   together to verify that I was at work on that date that I
19   was alleged to have been AWOL.
20                 I made -- I wrote two letters actually to
21   Arlen Specter.  The first letter was pertaining to the
22   services and how I felt the services, the veteran services
23   were being -- veterans were not receiving the services they
24   were entitled to because of the various changes that had
25   taken place at the VA.
```

13

1          And I also stated in it because of that, my

2    role had changed in terms of the services I provided to

3    veterans and also related to him the fact that I had been

4    docked without any type of investigation of eight hours of

5    my pay.

6          Q          And your testimony is that you wrote two

7    separate letters?

8          A          Yes.  There was a response to a letter that

9    was written to him regarding my initial letter.

10         Q          What was the date of your first letter?

11         A          I have the documents, but I can't recall the

12    exact date.  But it was shortly after the March 21st date.

13    It was like two weeks after that or whatever that I learned

14    that my pay had been docked.  So it was in the next few

15    weeks.

16         Q          How did Ray Kent violate your rights based

17    upon those letters to Senator Specter?

18         A          I went to Ray Kent on several occasions

19    early, within weeks of being assigned to that unit.  And I

20    expressed my concern with the way I was being treated, and

21    the fact that I did not feel that I could work in that

22    environment.  And I asked him about being transferred to

23    another unit.

24         Q          Anything else?

25         A          Well, I shared with him a lot of things

14

1    that -- the conditions that were very unpleasant for me and

2    how I was being treated.  And I even sent e-mail messages

3    to him, forwarded messages to him regarding various

4    messages I had received on a daily basis from the managers

5    while I was in that unit.

6        Q        Did Ray Kent take any action against you?

7        A        Any action?

8        Q        Correct, any employment-related action

9    against you?

10       A        He listened, and he didn't really advise or

11   give me any kind of directions.  After several visits, he

12   just finally told me, you know, that they didn't want you

13   in the unit; and that I have to fight it out myself.

14                Oh, and to go along with them, something to

15   that effect.

16       Q        How did Scott Shreve violate your First

17   Amendment rights?

18       A        When I first came over assigned to that

19   unit, we were assigned the big room, which was a storage

20   room, I guess.  It was a door with a window on it, a small

21   window, which didn't allow for very much privacy.

22                There were other offices that had windows.

23   And they had posters over those windows for privacy.  And

24   the doors were also closed most of the time.

25                On one day I had asked about putting

```
1    something over the door, and it was approved.  One day

2    Scott Shreve came into my office, stood over me as I was on

3    the computer, and told me that I was to take the poster off

4    the door and I was supposed to leave the door open at all

5    times.

6         Q         When did that happen?

7         A         This was shortly after I was assigned to

8    this unit.

9         Q         So this would be shortly after February of

10   2000?

11        A         Oh, yes.

12        Q         Was this before you wrote the letter to

13   Senator Specter?

14        A         I made another complaint after this happened

15   with him.

16        Q         I'm sorry --

17        A         I made an EEO complaint regarding this.

18        Q         But my question is, did the incident in

19   which Dr. Shreve told you to take the poster off the

20   window, did this happen before --

21        A         I can't recall the exact time period.  But

22   it was within that period of time, somewhere around there.

23        Q         Do you recall whether it was before --

24        A         I can't recall the exact date.

25        Q         I know you can't recall the exact date.
```

16

1    What I'm asking is, it was sometime after February of 2000,

2    but was it before you wrote the letter to Senator Specter?

3        A        I can't recall the exact date.

4        Q        And you filed an EEO complaint based upon

5    this incident?

6        A        That was the first -- no, that was one of

7    the incidents.  That was the dock in pay for eight hours,

8    there was a letter of reprimand.

9        Q        How many EEO complaints did you file?

10       A        Each time there was a different incident, I

11   was told, advised, to file, to make the complaints.

12       Q        Do you recall how many you filed?

13       A        There was one for the -- no, I don't recall

14   the exact number.

15       Q        Did Dr. Shreve do anything else that

16   violated your right to freedom of speech?

17       A        When I asked to meet with him -- this was

18   earlier, I asked to meet with him and I think Miss Scott

19   regarding my concerns in terms of the program and in terms

20   of the way I was being treated.

21       Q        What did he do at that time which you

22   considered to be a violation of your First Amendment

23   rights?

24       A        He didn't do anything.  He just refused to

25   meet with me.

17

```
 1          Q          Anything else that Dr. Shreve did?

 2          A          He made life very uncomfortable for me.

 3          Q          How did he do that?

 4          A          By the things he said.  The way he -- his

 5   mannerism around me.

 6          Q          Can you remember some examples of the things

 7   that he said?

 8          A          I can't recall specifics other than that

 9   meeting in my office.

10          Q          This is the one in which he refused to meet

11   with you?

12          A          No, that was another, that was a different

13   time.

14          Q          I see.  Excuse me.  So what you're referring

15   to is when he told you to take the poster down?

16          A          He told me to take the poster down.  And he

17   told me to keep my door unlocked and open at all times.

18          Q          What did Charleen Szabo do that you believe

19   violated your First Amendment rights?

20          A          When I wrote my letter to -- well, earlier

21   when all of this was going on, I mean, I was receiving

22   daily messages in the computer from Beulah Hadrick and Lola

23   Scott.

24                     And I asked to meet with Ms. Szabo earlier.

25   She didn't want to meet with me.
```

18

1      Q        Do you recall approximately when that
2  happened?
3      A        I would say within two to three months of
4  being in that unit.  You asked another question which I
5  didn't respond to, because I was --
6      Q        Okay, go ahead.
7      A        I can't remember what it was.  You were
8  asking about the violation of my rights.  Oh, in my letter
9  to Mr. Specter, Arlen Specter, Senator Specter, she
10 responded back to him, her response was not accurate.
11 Because I was not assigned to nursing home, which she said
12 I was.  I was always in the residential care program.
13              And she stated that I -- something about to
14 the good of the service or whatever.  But for over 20
15 years, I had provided services as a social worker, and
16 there was never a problem with my job performance.  It was
17 always, my service was good.
18              MS. FRYE:  I would like to show Mr. Bailey a
19 letter here and see if we can make this an exhibit.  Don?
20     A        This is a letter that I was not assigned to
21 the community nursing homes.
22 BY MS. FRYE:
23     Q        First of all, have you seen this letter
24 before?
25     A        Yes, I have a copy of it.

19

```
1        Q           What's the date on this letter?

2        A           The date on it is April the 25th.

3                    MS. FRYE:  We will be marking this as

4   Defendants' Exhibit 1.  And I will make copies afterwards.

5                    (Letter dated April 25, 2000 marked as

6   Defendants' Exhibit Number 1.)

7   BY MS. FRYE:

8        Q           Who was this letter to and who is it from?

9        A           It says dear Senator Specter, from Charleen

10  Szabo.

11       Q           What in that letter do you feel violated

12  your rights?  Can you read the portion that you --

13       A           She says, on March 21, 2000, she was

14  assigned to visit private nursing facilities to review the

15  VA patients at these facilities.  Due to her failure to

16  follow supervisor's instructions, her activities during

17  that day were in question and resulted in a proposed

18  disciplinary action.

19                   While, first of all, like I say, it wasn't

20  community nursing homes, it was personal care homes.

21       Q           Anything else?

22       A           Then she says I had responded to the

23  proposed disciplinary action with documentation to support

24  her actions on March 21st that had not been previously

25  shared.  Wait, wasn't previously shared because it wasn't
```

20

1    asked, and I wasn't aware of it until after the actions had

2    already been taken.

3        Q        Is there anything else in that letter from

4    Ms. Szabo that you believe violates your rights?

5            MR. BAILEY:  Let me just place, so I don't

6    want to interrupt the deposition, I want to object to the

7    form of these questions, being individual fact questions

8    followed up with violate your rights.  Let the objection be

9    noted.  Thank you.

10            MS. FRYE:  Okay.

11   BY MS. FRYE:

12       Q        May I have that letter so that I can give it

13   to the court reporter.  Thank you.

14            MR. BAILEY:  What's the date on that, Cathy?

15   Do you have a copy of it, by the way?

16            MS. FRYE:  I will get you a copy after.

17            MR. BAILEY:  What's the date?

18            MS. FRYE:  April 25th, 2000.

19   BY MS. FRYE:

20       Q        What do you believe that Beulah Hadrick did

21   which violated your First Amendment rights?

22       A        There were a number of things that I felt

23   were in violation of my rights.  From my, coming into the

24   unit, I felt I was in a very stressful, a very unpleasant

25   environment where I was under daily scrutiny.  I was

1   treated differently.  There were other employees who were

2   spying on me.

3          When I made -- when I responded to computer

4   messages, there were other messages.  My messages were

5   forwarded to other people.

6          I was told that I wasn't supposed to use a

7   government car, but one of the other social workers told me

8   that he was still using his car.  And it wasn't until after

9   I brought this to the point of the supervisors that they

10   spoke with him about it, but at this time I had already

11   been reprimanded.

12          I was told that I was supposed to make

13   visits when other social workers were not making the

14   monthly visits, as they say, which I have documents to

15   support this.

16      Q      Let me ask you some more specific questions

17   regarding your answer.  What specifically did Ms. Hadrick

18   do that caused your work environment to be stressful?

19      A      There were the constant, there was a daily

20   scrutiny of my messages in the computer, there was call to

21   the operators about whether or not I had told them my

22   activities for the day.  I had to put messages in the

23   computer to seven, eight different people.

24          There was the call, like I say, to the

25   transportation people to find out what time I picked the

1    car up, what time did I come back with the car.

2             There were calls to my personal care homes.

3    On two separate occasions I received a call when I was in

4    the home, and I was told -- I mean, I hadn't been to the

5    home a good 30 minutes, and I was told to get back to the

6    VA, they wanted to have a meeting with me; and if I didn't

7    come back, I would be charged with AWOL.

8             I had personal care home sponsors who told

9    me that they felt they had been badgered by people from the

10    VA calling up to find out if I had made visits there.

11    Q       Who told you that?

12    A       Personal care -- one of the personal care

13    homes that I had to visit.

14    Q       Which home was that?

15    A       That was Akron Haven.  Also Independence

16    Terrace, which is not Independence Terrace anymore.  I was

17    told that they had received a call.

18    Q       When did this daily scrutiny and requiring

19    that you call in, when did this begin?

20    A       When I was assigned to this unit, before

21    coming to this unit we worked in personal care homes, we

22    were allowed to use the government car.  And we were also,

23    at that point for a brief period, we were told that if we

24    were in the field, we could take the car home, and we could

25    bring the car back in that next morning.

1       MR. BAILEY:  I think I did.  Let me

2   double-check and see.  I think I put this together in a

3   packet I sent you.  It's got to be deeper down in here.  If

4   you have a copy, we can just work off of that.  There's no

5   objection to it.

6       MS. FRYE:  If you don't object, as far as I

7   know, the marking -- I don't know who made the marks, and I

8   don't intend to ask her any questions related to the marks.

9       MR. BAILEY:  Hey, you can ask her if she

10  made them.  If she made them, I think she has to answer.

11  But I don't think she did, but I don't know.

12  BY MS. FRYE:

13      Q       Mrs. Wright, do you recognize that letter?

14      A       Yes, I do.

15      Q       Did you write that letter?

16      A       Yes, I did.

17      Q       Did you make the marks that are on it?

18      A       What marks?

19      Q       Oh, there's a star down there in the margin.

20      A       No, I didn't make the star and the marks.

21      Q       All I really wanted to do was establish --

22      MR. BAILEY:  Who made the marks?

23      MS. FRYE:  No.  That the letter was sent and

24  the date that it was sent.

25      MR. BAILEY:  I think that was sent to me, by

32

1   the way, by Bill Livingston.

2                   MS. FRYE:  Okay.

3   BY MS. FRYE:

4        Q        I believe that you testified that you also

5   wrote Senator Specter another letter?

6        A        Um-hmm.

7        Q        Do you recall what the other letter said?

8        A        It was in response to the response that was

9   sent by the, well, it was signed by Miss Szabo.

10       Q        Do you recall about what date the other

11  letter was sent?

12       A        May, June, I'm not sure of the exact date.

13       Q        Did you provide a copy of that letter to

14  anyone at the VA hospital?

15       A        Which letter?

16       Q        The second letter.

17       A        No, why would I provide a letter to someone

18  at the VA?  No.

19       Q        I don't know.  I'm just asking.

20       A        No.  It may have been part of the other

21  hearings, I don't know.  If that's what you mean.

22       Q        What do you claim that Ray Kent did that you

23  are complaining about after you sent that letter?  What

24  actions of Ray Kent after you sent that letter are you

25  complaining about in this lawsuit?

33

```
 1       A        Say that again.

 2       Q        What actions on the part of Ray Kent that

 3  occurred after you sent that letter are you complaining

 4  about?  I'm asking you what specifically you are claiming

 5  he did to you after you sent that letter.  If anything.

 6       A        I went to Ray Kent --

 7                MR. BAILEY:  One second.  Cathy, I do have a

 8  clean copy of that record, of that letter, if you want it.

 9  I think I do.

10                MS. FRYE:  Is it --

11                MR. BAILEY:  Let me see it and compare here.

12  If you want your copy back.  This is Philadelphia Regional

13  Counsel.  So yes, this came from you folks somewhere.

14                MS. FRYE:  Okay.

15                MR. BAILEY:  And I do have a clean copy, if

16  you need that.

17                MS. FRYE:  How about if we -- I will mark

18  this as a defense exhibit.

19                MR. BAILEY:  Okay, as I was saying, I have a

20  clean copy here, if you need it.  Do you want it?

21                MS. FRYE:  Yes, I would, but don't take it

22  apart.  How about if we mark it Defense Exhibit 2, and at

23  the end of the proceeding today, I will make a copy off of

24  yours.

25                MR. BAILEY:  Okay.
```

34

1          MS. FRYE:  Thank you.

2          (Letter dated April 8, 2000 marked as

3    Defendants' Exhibit Number 2.)

4    BY MS. FRYE:

5          Q          My question is, what, if anything, did Ray

6    Kent do after you sent the April 8th letter that you are

7    claiming violated any of your rights?

8          A          As Ray Kent had stated, I was in his office

9    frequently regarding issues with this unit.  I even asked

10   Ray Kent about a transfer to another unit.  I asked about

11   other openings and other positions that I could be

12   transferred to.

13         Q          How did he respond?

14         A          I don't remember his exact response, but

15   it -- what it amounted to, there was nothing he could do.

16         Q          Was there anything else?

17         A          He told me that I would have to deal with it

18   myself or fight it out myself, that I was not wanted in the

19   unit, they did not want me there.

20         Q          Did you ever file a grievance over this

21   issue?

22         A          Which one?

23         Q          The issue of the docking of the pay.

24         A          Yes.

25         Q          How was that grievance resolved?  Did that

35

1    grievance go to arbitration?  I mean a union grievance.

2        A        There was a union initially involved.  But

3    it wasn't resolved as a result of the union.  It was

4    resolved as a result of my contact with Arlen Specter, it

5    was after that fact.

6        Q        Again, I want to go back to the date of this

7    letter, which is April 8, 2000.  What if anything did

8    Dr. Shreve do after that date that you feel violated your

9    rights?

10       A        Dr. Shreve did not allow me an opportunity

11   to speak with him to discuss the issues that were going on.

12       Q        I'm sorry, you may have already said this,

13   do you recall when that incident occurred?

14       A        Which incident?

15       Q        His refusal to speak with you about the

16   issues.

17       A        Even after that, he -- we had no contact.

18   During all this time.  But he signed off.  He was never in

19   any of the meetings that we had that were called.  The

20   times that I was called back from the home.

21       Q        What specifically did Charleen Szabo do

22   after the date of this letter that you feel violated your

23   rights?

24       A        Well, the letter -- the response, whoever

25   wrote the response, had her name signed on it.

1    Q        Anything else?

2    A        She made statements that were not true.

3    They were misleading.

4    Q        What about Beulah Hadrick, what did she do

5    after the date of this letter that you feel violated your

6    rights?

7    A        My rights were violated on a daily basis

8    through harassment, through the computer, through the daily

9    watching, through the telephone calls to the transportation

10   people, to the operators.

11   Q        And that began soon after you became

12   supervised by Beulah Hadrick?

13   A        Almost immediately upon coming into that

14   unit.  I have a chronological listing of different events

15   that happened.

16   Q        Do you recall when your pay was docked?

17   A        I recall being aware of it two weeks after

18   the pay period, which was after the 21st date, after that

19   pay period.  It was like the next following pay period.

20   Q        And so this was --

21   A        That I received -- well, actually, that I

22   received notice.

23   Q        So this --

24   A        On my pay.

25   Q        You became aware of this sometime after

1  March 21st?

2      A       That's correct.

3      Q       And when was your pay restored?  Put back in

4  your check.

5      A       Sometime after that letter to Arlen Specter.

6      Q       About how long, do you recall?

7      A       I don't recall exactly.

8      Q       I'm going to refer you again to the

9  complaint and ask you for a few specific facts relating to

10  the allegations.  Just bear with me a moment.

11           If you would refer to Paragraph 21, which is

12  on Page 4 of the complaint.  In that paragraph, you allege

13  that the torment and harassment includes having other staff

14  and third persons watching report on you and forcing you to

15  follow demeaning reporting procedures that no other

16  employee has to follow.

17           What do you mean by that, what demeaning

18  reporting procedures did you have to follow that no one

19  else did?

20      A       After the pay had been docked and I had to

21  prove my innocence, I was given two separate questionnaires

22  to respond to as to where I was that day, who I saw.  I

23  mean, it was eight different questions.  Nobody else had

24  to, you know, respond to any questionnaires like this.

25  This is on two separate occasions.

38

1          First they gave a date that was incorrect,

2     that alleged that I was AWOL.  After I gave them the

3     necessary clients that I had seen that day and responded to

4     those questions, then within another day or so, they said

5     well, no, that's the wrong date.

6          And then I was given the same questionnaire

7     to respond to again, which I did, with documentations with

8     my telephone cell log which would show that I contacted the

9     VA, which showed that I had contacted the homes, and that I

10    had received calls on my telephone cell log, plus I got

11    letters from my personal care home sponsors stating that I

12    was there.

13    Q          Were there any other reporting requirements

14    that you were required to follow that no one else was?

15    A          Yes, in terms of the monthly visits and also

16    the use of overtime.  There was another social worker that

17    was given the opportunity to work from home at one period

18    of time there.  Also she was allowed, she was given

19    overtime for her work and visits to the home.

20         There were a number of homes and patients

21    that were not seen on a monthly basis by this individual.

22    Q          And who was this individual?

23    A          She's no longer there.  Her name was

24    Bernadine Santano, something like that.

25    Q          About when did she leave the Lebanon VA?

```
 1        A        She just left about a month or so ago, two
 2   months ago.
 3        Q        When was she allowed to work at home,
 4   approximately?
 5        A        It was during the period of time that I was
 6   there.  Well, I actually happened to find out by accident
 7   because the operator called up and asked for her, so I had
 8   to cover something of hers.  And that's when I got the
 9   information that she would get her calls at home or
10   something like that, so.
11        Q        Do you recall when that was?
12        A        No, but I have it written in my documents.
13        Q        If you look at Paragraph 27 of the
14   complaint, where you state that Defendant Hadrick subjected
15   you to a litany of harassing misrepresentations, what
16   misrepresentations did Beulah Hadrick subject you to?
17        A        To go back to the AWOL, she had me, in terms
18   of my -- in terms of messages in the computer, in terms of
19   her contact with my personal care home sponsors, in terms
20   of the contacts with the transportation people, with the
21   telephone operators.
22        Q        Let me make sure I understand your answer.
23   When you refer to the AWOL incident, you are referring to
24   the incident in which your pay was docked and then
25   restored?
```

40

1    A        Pay was docked and then restored.  Also the

2    two occasions where she told me that if I did not return

3    back to the VA, that I would be charged with AWOL.  And I

4    was visiting homes.

5    Q        In what way are those misrepresentations?

6    A        In what way was -- well, the thing was, I

7    was visiting the home, and she implied that I was not

8    visiting with patients.

9    Q        Did she imply this in her conversation with

10   you?

11   A        She even told -- she told me that, well,

12   you've been there long enough.  She didn't know what time I

13   arrived or how many patients were in the home to be seen on

14   that day.

15   Q        When you referred to messages in the

16   computer as an example of misrepresentations by Ms.

17   Hadrick, what do you mean by that?

18   A        When I would respond to a message in the

19   computer, there would be another -- there would be a

20   challenge to that response.

21   Q        From --

22   A        They were messages that were forwarded to

23   other people who did not have any need to know the

24   conversation that existed, that was, you know, between us.

25   Q        Who would she forward the messages to?

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

41

1    A        Well, Ray Kent received some.  In fact, I

2    even made a point of making him aware that messages were

3    being forwarded to him.

4    Q        Anybody else you know of?

5    A        There was also messages to the operator that

6    were not necessary to be sent to the operator.

7    Q        What kind of messages are you referring to

8    that didn't need to be sent to the operators?

9    A        I can't tell you specifically what the

10   extent of the conversation was, the exchange was.

11   Q        Again, in Paragraph 27, you state that

12   Defendant Hadrick subjected you to reporting requirements.

13            Now, you have already mentioned the report,

14   the two forms -- two questionnaires you had to fill out

15   during the docking incident.  What other reporting

16   requirements did Defendant Hadrick impose upon you that you

17   refer to in Paragraph 27?

18   A        There was the computer message to seven, I

19   think it was seven different people.  We had to send a

20   computer message in terms of where we were or where we were

21   going.

22            We also had to have a weekly listing of

23   homes that you were going to visit.  You were also required

24   to, I think -- I mean, there must have been about ten

25   different things that you were supposed to do, that they

42

 1    expected you to do in terms of the. . .

 2         Q         The other social worker, Mr. Ratkoff, is

 3    that right?

 4         A         Um-hmm.

 5         Q         What was his first name?

 6         A         Gregory.

 7         Q         Did he have to do those -- make those

 8    reports also?

 9         A         He was given, I think, the same list.

10         Q         At Paragraph 28, you state that Shreve has

11    personally participated -- I'm sorry, strike that.  Shreve

12    forced you to alter your office procedures and office

13    appearance.  What are you referring to in that paragraph?

14    It's Paragraph 28.

15         A         That was when he came into my office  --

16                   MR. BAILEY:  Paragraph 28.

17         A         -- and instructed me to take the poster off

18    of the window, to keep my door open and unlocked at all

19    times.

20    BY MS. FRYE:

21         Q         Is there anything else that he forced you to

22    change?

23         A         I can't remember the other things, but I

24    have it written down.  Oh, back to that part about the

25    other social worker.  The other social worker, like I said,

116

1     Q       Right.  So it was his job to contact you,

2 basically, and he contacted you.  It wasn't some secretive

3 thing, right?  He let you know that Mr. Biro had contacted

4 the agency about your complaint?

5     A       I can't remember how -- who contacted me, but

6 someone, you know, made me aware that I had -- you know, my

7 inquiry had been made to Mr. Biro.  I had made a...

8     Q       Had you in the meantime attempted to contact

9 Senator Specter?

10     A       I had contacted Senator Specter I think it was

11 in -- shortly after I had received the AWOL, which was March,

12 which was less than a month of my being in the extended care

13 product line.

14     Q       What was the resolution of the AWOL accusation

15 that was made against you?

16     A       After I made contact with Arlen Specter, there

17 was further investigation where they actually did contact the

18 personal care homes and I also presented documents.

19     Q       Is that where you presented the documents that

20 we looked at in the earlier part of your deposition, like two

21 or three statements or so from veterans or the homes or

22 whatever?

23     A       From the homes and also my cell log.

24     Q       My question was, what was the resolution of

25 the AWOL issue?

117

1    A        The resolution was that the AWOL charges was

2    dropped and my eight hours of time was restored.

3    Q        And when were your eight hours of time

4    restored?

5    A        Sometime in April.

6    Q        Of what year, please?

7    A        Of 2000.

8    Q        And who was the person that took, if, indeed,

9    there was one person or more, who were the persons or person

10   who took the eight hours from you, alleging you to have been

11   AWOL?

12   A        Beulah Hadrick's name was attached to the

13   AWOL.

14   Q        Now, you indicated that at some point you had

15   initiated an EEO complaint, and by that I mean not EEOC, I

16   mean the internal EEO complaint process.  You initiated that

17   process in the Veterans Administration; am I correct?

18   A        Correct.

19   Q        And when did you do that?

20   A        That would have been in, I think in March.

21   Q        Of the year?

22   A        March of the year 2000.

23   Q        All right.  And would you lay out, as

24   succinctly as you can, the chronology of how that process

25   progressed.  Do you understand that question?

```
1         A         Uh-huh.

2         Q         Okay.  Paragraph 13, they moved the

3    residential program to the extended care program.  Did that

4    take place around February 2000?

5         A         Correct.

6         Q         At that time were you placed under the

7    supervision of Mrs. Hadrick and Mr. Shreve?

8         A         Correct.

9         Q         It's actually Dr. Shreve.

10        A         Well, Lola Bell Scott was actually the

11   first-line person.

12        Q         Yes, Lola Bell Scott answers directly to

13   Mrs. Hadrick; is that correct?

14        A         Correct.

15        Q         And you were actually, you were subordinate to

16   Ms. Bell; right?

17        A         Yes.

18        Q         What was her name?

19        A         Lola.

20        Q         Lola Bell.  Okay, Lola Bell.  Now, paragraph

21   15 says:  "Since that time, as a black person, plaintiff has

22   been singled out and treated in an unjust, cruel, disparate

23   fashion in a concerted effort to create a progressive

24   disciplinary record so defendants can force her to resign or

25   terminate her."
```

1           Now, that's an allegation of mistreatment

2    based on race.  Now, race, confining it to race, not your

3    complaints to officials, but on the issue of race, why do you

4    make that allegation?

5        A        I make that allegation because within three

6    weeks of being there I was accused of being AWOL and I had to

7    submit documents, which were not acknowledged until after my

8    contact with Senator Specter.

9           Also, the allegations that my not following

10   orders, one of the other social workers was also using his

11   car to make home visits and that person was not disciplined,

12   but I was disciplined and told that I was not following

13   orders.

14          Also --

15       Q        What's the race and sex of that person?

16       A        It's white male.

17       Q        Go ahead.

18       A        I was also told about -- when I was told about

19   seeing veterans on a monthly basis, the other workers were

20   not.

21       Q        They were not treated in a similar fashion?

22       A        They were not treated in a similar fashion.

23   There are documents that show that monthly visits were not

24   made by other social workers, and that there were several

25   visits that were not made on a monthly basis, a number of

1  of the work load and in terms of participating, being allowed

2  to go to educational training I was denied, and in terms of

3  the monthly visits which were not made by other social

4  workers but I was singled out as a person who was said not to

5  be following orders and doing my job.

6      Q        Now, Sammi, paragraph 21 alleges that you were

7  tormented and harassed and that even third persons watch and

8  report on her, force her to follow demeaning reporting

9  procedures that no other employee has to follow, and the

10  allegation is that these are classic racist tactics.

11          Excluding the allegation that these are

12  classic tactics used against black victims of racial

13  mistreatment, what do you mean, can you provide us more facts

14  about what you mean by third persons watching and reporting

15  on you and following you and forcing you to report that other

16  employees don't have to report?

17      A        The operators reported that they were being

18  called about my activities, also the transportation people.

19  Other workers also had been interviewed or asked questions

20  about my activities.  Each morning when I would enter the

21  office, there was one particular person who would watch my

22  activities and she would go back and report to Lola Scott.

23  It was very obvious what was going on.

24      Q        What explanation was ever given to you for

25  watching you, following you or reporting on your activities?

1    A         Explanation was --

2    Q         Sure.  I'd like to know did Mr. Kent ever give

3    you an explanation as to why you were surveilled, monitored,

4    followed?

5    A         No, Mr. Kent never gave an explanation.

6    Q         Well, how about --

7    A         Mr. Kent only told me to -- he only listened

8    and told me to go along.  At one point he just told me that I

9    have to fight it out myself, because I hadn't -- I was not

10   wanted in the unit in the beginning.

11   Q         Did you take his words about not being wanted

12   as a suggestion that you should perhaps consider leaving?

13   A         I even tried to leave.  I put in -- I asked to

14   be transferred to another unit and I was denied.

15   Q         And who denied you, Sammi?

16   A         Beulah Hadrick denied me, I guess with the

17   approval of Mrs. Scott.

18   Q         Well, did Mr. Shreve, Dr. Shreve ever tell you

19   why you were being monitored so closely, why the poster was

20   taken off your door, any of those things?

21   A         Mr. Shreve did not tell me why the poster was

22   being taken off, why I should take the poster off.  He just

23   demanded that I take it off and that I keep my door open.

24   Mr. Shreve refused to have any contact with me regarding the

25   issues.  On occasion that I asked to speak with him regarding

151

1    some of the concerns I had in the unit, he wouldn't meet with

2    me.  He told me to just write a list of it to his secretary.

3         Q        And why did you want to talk to Dr. Shreve?

4         A        Well, Dr. Shreve was the -- over both Lola and

5    Beulah Hadrick.

6         Q        So --

7         A        So --

8         Q        I'm sorry.

9         A        So he would have been the person in terms of

10   the chain of command to speak with.  If the two people who

11   were the second, you weren't able to relate to them, he would

12   have been the next person up the line to speak with.

13        Q        Are you -- I'm sorry.  Go ahead.  Were you

14   done?

15        A        In following the chain of command, he would

16   have been the person I should speak with if I was having some

17   problems with the other two people.

18        Q        I think we have enough.  Did Beulah Hadrick

19   ever give you an explanation for why these things were being

20   done to you?  Did she ever tell you what it was about?

21        A        Beulah Hadrick was always very nasty, very

22   curt and very distant with me.  Her approach was always a

23   demanding you do this, you do that, and there was no

24   explanation, there was no discussion.  It was just her way.

25   That's just the way it was.

152

```
 1        Q        Now, Beulah Hadrick is black; is that correct?

 2        A        That is correct.

 3        Q        Did she treat white employees --

 4                 (Pause.)

 5   BY MR. BAILEY:

 6        Q        Let me go back and repeat that question.

 7   Strike the last question.

 8                 Is Beulah Hadrick an African-American, is she

 9   a black, as the common vernacular is, a black citizen, a

10   black person?

11        A        She's a black person.

12        Q        Now, based on your experiences, did she treat

13   white employees at the same level that you were doing the

14   same types of things better than you?

15        A        I felt she was treating white employees better

16   than me.

17        Q        And is it your allegation that Beulah Hadrick

18   mistreated you on account of your race, based on your

19   experiences on the job?

20        A        Based upon my experiences on the job, yes.

21                 MR. BAILEY:  Cathy, there's about 15 minutes I

22   guess probably left on the videotape.  It's 10 minutes to 12.

23   I'm going to make a suggestion.  I'm sure you're going to

24   have questions and I'm going to make a suggestion to let you

25   prepare a little bit that we take a lunch break now, I'm very
```

1    claiming that she did anything else to you?

2        A        She refused to meet with me in terms of

3    discussing this case.

4        Q        Anything else?

5        A        In terms of what?

6        Q        Are there any other actions of Charleen Szabo

7    that you --

8        A        She signed off on all that information that

9    was given to her regarding the suspension, the reprimand, the

10   termination, whatever.

11       Q        Anything else?

12       A        That pretty much covers it.

13       Q        Mr. Bailey went through the paragraphs and in

14   reference to paragraph 20, I believe that you testified that

15   white employees had been treated better than you.  So what I

16   would like to explore just briefly is, is it your testimony

17   that the reporting requirements that were imposed on you

18   concerning your schedule and so on were imposed because of

19   your race?

20       A        Did I say that the reporting requirements that

21   were --

22       Q        No, I'm asking if that's what you believe.  I

23   don't think you said that.  You went through a number of

24   different actions that you said were harassment and one of

25   them was that you were required to report to eight different

1  people by e-mail every day, I think.  Is it your testimony

2  that that requirement was imposed on you because of your

3  race?

4      A        I'm saying it was imposed differently from --

5  on me than it was on other employees who were white.

6      Q        And can you tell me what other employees

7  you're referring to that were white?

8      A        Well, there were -- after Greg left, there was

9  another white employee who has now left, too.

10     Q        And is it your understanding that these

11 employees were not required to follow the same reporting

12 procedures that you were?

13     A        It is -- from what I observed, the

14 requirements were different.

15     Q        Do you know specifically what was required of

16 the white employees?

17     A        In terms of the use of the car, there was an

18 incident where I was reprimanded for having used my car to

19 make a home visit.  And when I pointed out that one of the

20 other social workers was using their car and that person had

21 not been reprimanded, it wasn't until after that that this

22 person was alleged to have gotten some kind of reprimand.

23              Also, in terms of the reporting, they were not

24 calling up the garages and calling up the operators on other

25 employees in terms of their contacts with them.

1      Q        Let me just go back to the reprimand you

2   mentioned.  Was that a formal reprimand?

3      A        What?

4      Q        The reprimand regarding the car.

5      A        That was supposed to have been a part of

6   the -- that was a part of the -- when you say a formal, what

7   do you mean, was something actually written up?

8      Q        Yes.  Was that part of progressive discipline?

9   Did it go in your personnel file?

10     A        I think that was a part of the original

11  reprimand that was later dropped.

12     Q        Now, in your chronology, which your attorney

13  has given me a copy of one page of, if you look on your

14  chronology, you'll see that on 4/18, it says:  "Scott Shreve

15  entered my office very nasty and loud, demanded I take a

16  poster off the door and I keep my door open."  That was

17  4/18/00.

18              Now, at your earlier deposition, I asked you

19  when this incident occurred and you did not recall.  Does

20  this refresh your recollection and do you believe it's

21  accurate that this incident occurred on April 18th, 2000?

22     A        I believe it's accurate.

23     Q        Now, to get back to the incidents of

24  harassment that you describe under Mr. Bailey's questioning,

25  is it your belief that you were charged with AWOL because of

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

159

1    your race?

2         A        Yes, that is my belief.

3         Q        Is it your belief that your pay was docked

4    because of your race?

5         A        Yes, I believe that's exactly what happened,

6    too.

7         Q        Is it your belief that you were suspended

8    because of your race?

9         A        All of the behaviors, the mistreatment I think

10   was based upon the fact that I was a black female.

11                MS. FRYE:  That's all I have.

12

13                     RECROSS-EXAMINATION

14

15   BY MR. BAILEY:

16        Q        Do you know whether the ultimate EEO decision

17   was that you had been retaliated against?

18        A        The decision?

19        Q        Either EEO or EEOC, do you know what their

20   ultimate decision was or if it even addressed that issue, if

21   you know?

22        A        I have copies of it.  I can't recall

23   specifically what the --

24        Q        Would you get those for me?  That's all right,

25   just get them.

160

1          MR. BAILEY:  I don't have anything further.

2          MS. FRYE:  I guess we're done.

3          THE VIDEO OPERATOR:  It is now 12:40 p.m.  The

4     deposition of Sammi D. Wright is completed.  We are now

5     suspending video operation.

6          MR. BAILEY:  Just one last thing, Cathy, I

7     want to get it on the record here.  The other related case

8     things are, they're pleadings and decisions, all that kind of

9     stuff.  You don't have any objection to their being included,

10    incorporated by reference?  I mean they stand what they stand

11    for as a matter of law, I don't mean that, but I mean like as

12    exhibits and stuff.

13         MS. FRYE:  No, I don't have any problem.

14         MR. BAILEY:  I'm not asking for, obviously,

15    some --

16         MS. FRYE:  You're not asking for me to agree

17    with you, just that I agree that they can be exhibits.

18         MR. BAILEY:  They can be exhibits and you can

19    object at the appropriate times and all that stuff.

20         MS. FRYE:  Right.

21         MR. BAILEY:  Okay.  Thank you.

22         (The deposition was concluded at 12:41 p.m.)

23

24

25

161

```
 1   STATE OF PENNSYLVANIA      :
                                : ss
 2   COUNTY OF DAUPHIN          :

 3           I, Sherry Bryant, a Reporter Notary-Public,

 4   authorized to administer oaths within and for the

 5   Commonwealth of Pennsylvania and take depositions in the

 6   trial of causes, do hereby certify that the foregoing is the

 7   testimony of SAMMI D. WRIGHT.

 8           I further certify that before the taking of

 9   said deposition, the witness was duly sworn; that the

10   questions and answers were taken down stenographically by the

11   said reporter Sherry Bryant, a Reporter Notary-Public,

12   approved and agreed to, and afterwards reduced to typewriting

13   under the direction of the said Reporter.

14           I further certify that the proceedings and

15   evidence contained fully and accurately in the notes by me on

16   the within deposition, and that this copy is a correct

17   transcript of the same.

18           In testimony whereof, I have hereunto

19   subscribed my hand this 20th day of September 2002.

20

21

22                        Sherry Bryant, RMR/CRR

23   My commission expires:
     December 13, 2005

24

25
```

 

**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

April 25, 2000

In Reply Refer To: 595/N121

The Honorable Arlen Specter
United States Senator
9400 Federal Building
600 Arch Street
Philadelphia, PA 19106

Dear Senator Specter:

Ms. Sammie Wright is employed at this medical center as a Social Worker in our Community Nursing Home Care Program. On March 21, 2000, she was assigned to visit private nursing facilities to review the VA patients at these facilities. Due to her failure to follow her supervisor's instructions, her activities during that day were in question and resulted in a proposed disciplinary action.

The procedures for that disciplinary action included the opportunity for an employee response. Ms. Wright has responded to the proposed disciplinary action with documentation to support her actions on March 21, 2000, that she had not previously shared with her supervisor.

When the additional information is reviewed, an appropriate response will be issued to resolve this issue.

Sincerely yours,

CHARLEEN R. SZABO, FACHE
Chief Executive Officer

Enclosure:
Constituent's Inquiry

cc:

Chief Executive Officer (N00)



RAKENT:plm    04/25/00    N121    N100    N00

**File Copy**

2248 West Hamilton Street
Apartment 208
Allentown Pennslyania
April 8, 2000

Senator Arlen Specter
442 West Hamilton Street
Post Office Building
Allentown Pensylania 18101

EXHIBIT

_Dep 13 2_
_7.9.02 KD_

Dear Sir:

I would like to know why Mental Health Services to veterans are being cut. As a social worker at the Lebanon VAMC, I have seen management's changes to programs and staff, decrease the efficiency in meeting veteran's needs.

These changes have increased the work load, but decreased staff, and greatly limited the accessibility of staff and services to veterans. Recent changes in this past month were restrictions placed on the availability, and use of government vehicles. This has limited the number of veterans seen and increased travel time.

On March 21, I used my own car to make home visits. Management was aware of this plan. I have attached letters from the homes visited.

I received a letter on 4/6/00 charging me with AWOL, yet eight hours of pay had already been taken from my pay before receiving the letter. The letter states further action of proposed suspension of 15 days without pay. I have until 4/21/00 to respond to these allegations.

Enclosed is a list of the charges I received on 4/6/00. I

trust that you will look into my concerns and issues regarding
management's policies and erroneous decisions.

Sincerely

Sammi D. Wright ACSW
(610) 751-2170

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMMI D. WRIGHT    )    NO. 1:CV-00-1657
    )
    Plaintiff    )
    )
    vs.    )    (JUDGE RAMBO)
    )
BEULAH HADRICK,    )
CHARLEEN SAZBO,    )
SCOTT SHREVE AND    )    COPY
RAY KENT,    )
    )
    Defendants    )    JURY TRIAL DEMANDED

DATE:        AUGUST 1, 2002

PROCEEDING:  VIDEO DEPOSITION
           BEULAH HADRICK

APPEARANCES:

    For the Plaintiff

        Don Bailey, Esquire
        4311 N. 6th Street
        Harrisburg, PA   17110

    For the Defendants

        Mary Catherine Frye Esquire
        Assistant U.S. Attorney
        228 Walnut Street
        Harrisburg, Pa   17110

BEULAH HADRICK

SHEET 1    PAGE 1

1    Video Operator:  Good morning, please be
2    advised the video and audio is in operation.  My
3    name is Tony Marceca and my address is 2219 Dixie
4    Drive, York, PA 17402.  I have been contracted by
5    PR Video to be the video operator for this
6    deposition.  The case is in the United States
7    District Court of the Middle District of
8    Pennsylvania. Its caption Sammi D. Wright,
9    plaintiff versus Beulah Hadrick, Charleen Szabo,
10   Scott Shreve and Ray Kent.  The title number is
11   1:CV-00-1657.  This deposition is taking place at
12   the law offices of Mr. Don Bailey in Harrisburg,
13   PA and it is being taken on behalf of the
14   plaintiff.  The time now is 10:04 AM on August
15   1,2002, and would the witness please raise your
16   right hand and state for the record.  Do you
17   swear to tell the truth, the whole truth so help
18   you God?
19       Hadrick:  I do.
20       Video Operator:  And your full name?
21       Hadrick:  Beulah Hadrick.
22       Video Operator: Mr. Bailey and Ms. Frye, can
23   we give a sound check?
24       Bailey:  My name is Don Bailey. I represent
25   the plaintiff in this matter, Sammi D. Wright.

PAGE 2

1    Frye:  My name is Mary Catherine Frye, I
2    represent the defendants in the United States in
3    this matter.
4        Bailey:  I think I should also say my
5    address is 4311 North 6th Street, Harrisburg PA,
6    17110.  My phone number is (717) 221-9500. And
7    Ms. Frye is the assistant to the United States
8    attorney. And her address and phone number is
9    publicly available, and that would be in the
10   federal building, right?
11       Frye:  That's right.
12       Q:  Beulah, and for the record, that's
13   spelled B-E-U-L-A-H, did I spell it correctly?
14       A:  Yes.
15       Q:  And the last name is Hadrick, H-A-D-R-I-
16   C-K, correct?
17       A:  That's correct.
18       Q:  Beulah, just a few short instructions
19   before we get into the depositions.  I do things
20   a little differently than most attorneys.  Your
21   attorney is probably, sadly if not I suppose,
22   familiar with listening to my little instructions
23   with this, I guess.  Briefly, this is a
24   deposition I'm sure you've been through other
25   proceedings, we'll be asking questions and you'll

PAGE 3

1    be answering things, of course.  I try to keep
2    things as relaxed as possible.  I want you to
3    feel relaxed and I want you to make sure you take
4    your time in answering fully and completely, OK?
5    Now, every once in a while I get into a train of
6    thought, I find the older I get the worse I get
7    at this.  I have a tendency to maybe interrupt or
8    I might come in with a question before you
9    complete it.  Please make sure you correct me,
10   and if your counsel doesn't catch it, usually she
11   does, of course.  If she doesn't catch it, you
12   know, only you really know if you're finished
13   answering the question.  Make sure you don't
14   leave something incomplete there and make sure
15   you stop me and you go on and get finished
16   answering the question.  The other thing I don't
17   mind this goes for your attorney also, if she
18   wants to, if you want to know where I'm going
19   with a particular line of questioning or if you
20   want to know what I mean by a question, I found
21   that it shortens the whole process and it makes
22   you feel you better if you even for curiosity
23   purposes want to ask me what I mean by a
24   question, have any confusion about a question.
25   Ask me to resolve it; I don't mind your asking me

PAGE 4

1    questions.
2        A: OK.
3        Q:  The other thing is that, from time to
4    time, we may be changing direction on a line or
5    group of questions, and if that happens at all,
6    please take your time, or ask for a moment, and
7    we'll clear that up.  If you need to talk to
8    Cathy Frye at any time during the questioning,
9    it's really not good practice to do it while
10   there's a question on the table, you're not
11   really supposed to.  That's all right, I don't
12   mind.  And you shouldn't discuss subsequent
13   matter during a deposition about questions that
14   are in the deposition either.  But if you want to
15   talk to Cathy about anything, please feel free to
16   do so, from your comfort brick or you just want
17   to take a break, please feel free to do so.  OK?
18   That being said, do you have any questions for me
19   before we begin, or any questions at all?
20       A:  No I don't.
21       Q:  Where do you currently reside?
22       A:  In Houston, Texas.
23       Q:  When did you go to Houston TX?
24       A:  February of 2002, no I'm sorry, 2003,
25   2001.

BEULAH HADRICK

PAGE 34

**PAGE 33**

1 Senator Specter and your knowledge of those
2 things. And your knowledge of the complaints
3 that Sammi Wright was making about how the
4 veterans should be cared for, and her criticisms
5 and some of those things. That's where I'm going
6 with this. I want to try to find out, you know
7 why people were moved around, who moved those
8 decisions, what the reasons for it were, how they
9 were performing, I want to find out if there was
10 some kind of management decision based on just
11 your internal investigation and evaluation on how
12 people performed. I'm trying to get the reasons
13 for some of these reorganization changes and I
14 can't seem to find a clear, maybe because I'm not
15 asking the right question. With that background,
16 let me try to ask some specific questions here to
17 give you an idea where I'm trying to go.
18     A: I could give you a little... the
19 reorganization; most VA's were reorganized under
20 service or product line. Where I am in Houston
21 it's service line, they either call it service
22 line or product line. At some point, several VA's
23 are service line or product line. Which means
24 all of the staff shift from service line to be
25 more efficient from the old structure to service

**PAGE 34**

1 lines. They did it for efficiency and
2 continuity. So, when we received mental health,
3 when we inherited mental health them, we met with
4 the director and she said that residential care
5 would now come under extended care for continuity
6 of care, the same way with geriatric sites, some
7 of those geriatric site patients, we also
8 inherited on the unit.
9     Q: Now, the reason for this reorganization,
10 I'm going to again, I'm assuming, paying from the
11 top down, this is something that came out of
12 Washington, or some congressional committee or
13 somebody from the top of Lebanon hospital.
14     A: The first service lines, yes, at some
15 point said that the VA should look into service
16 lines, product lines, whatever you call them, to
17 be more efficient in continuity of care. So, a
18 lot of VA's throughout the country are doing it.
19 For service lines, you can divide, you know
20 that's up to the director's discretion as to how
21 they are going to be divided, you know what comes
22 under what service lines. I mean we weren't
23 mandated to say, put surgery under extended care,
24 I mean, it's not a fit. Certain programs on
25 headquarters automatically come under residential

**PAGE 35**

1 care. That's one of them that are under the
2 umbrella of extended care. Residential care,
3 home care, all of those is in extended care. It
4 comes under the umbrella of extended care. They
5 would not fit under the umbrella of medicine nor
6 surgery.
7     Q: Did the source of this, let's call it a
8 recommendation, did you know if they did a manual
9 on it, or based on a study or anything like that?
10     A: Well it came out of headquarters,
11 meaning Washington, you know, going to service
12 lines, so, they have a lot of literature on it,
13 yes. They use for the community and other
14 hospitals.
15     Q: Were there meetings with the employees
16 at Lebanon hospital explaining this?
17     A: Before we went into the service line
18 there was planning and teams would meet and
19 groups would meet before we even started service
20 lines.
21     Q: So people were educated to changes and
22 told what had to happen and that sort of thing.
23     A: Right.
24     Q: Was Sammi Wright told about that?
25     A: I have no idea. She was not in my area

**PAGE 36**

1 like I said at that time.
2     Q: You don't know whether Sammi Wright ever
3 got the initial investigation, or the, excuse me,
4 or the initial information briefing about this
5 change?
6     A: I don't know, it was well known
7 throughout the hospital. I don't know how she
8 could...
9     Q: I'm not implying she did not get it, I'm
10 just saying, you personally don't know if...
11     A: No because we were not service lines
12 then and they were in mental health.
13     Q: Now, at some point, did you become
14 concerned about Sammi Wright's job performance?
15     A: Yes.
16     Q: When and how?
17     A: I don't remember the exact time, the
18 exact date, per se, like I said, we inherited
19 mental health. There was another social worker
20 that was either retiring, I can't remember the
21 exact circumstances or she was supposed to get
22 some of his patients. And it was at that point;
23 she was supposed to be carrying that load of
24 patients and she wasn't seeing them. Physically
25 visit them.

BEULAH HADRICK

Q: When Sammi Wright was initially assigned to you, she had a certain caseload.

A: Right.

Q: And you've already told us that these social workers went on doing the same thing they were doing before.

A: Yes.

Q: If I understand your most recent answer, at some point, Sammi Wright's caseload was increased.

A: Yes, they all were.

Q: They all were. How much?

A: I can't remember the number.

Q: Well, do you remember the percentage?

A: The social worker that left, that retired, they were divided up, she inherited some of those patients, I don't remember the exact number.

Q: But do you remember anything at all about the magnitude or extent of the increase?

A: It was slightly increased, but we were recruiting for social workers. When he left we also were recruiting social workers. We all have to carry a slight increase when a position is eliminated or gone and that person leaves.

Q: Are you stating that there was a slight increase?

A: Yes, but I don't know how much of an increase. I can't remember at that time.

Q: Well, I've done some rough work at the top of my head. I'm not any kind of, believe me, much of a mathematician. But I thought you had testified that there were three to four of these social workers. And you seem to have also testified that somebody left, and therefore the reason for the load being increased on the other social workers was because there were fewer of them now and you were advertising for one, so somebody had to pick up the load until you got one, right?

A: Right.

Q: Well, if there were four social workers...

A: I didn't say for sure four, I said three or four.

Q: If there were four social workers and one leaves, everybody picks up a third or fourth of a load, they have the load equally. Now there were three social workers, and then there's two left...

A: Actually toward the end, there was two left, Sammi and another social worker.

Q: Based on your managerial experience, and your recollection, given those small numbers. For example, if we had twenty-five social workers, and one social worker leaves, and everybody had twenty-five cases, they are going to get one additional case. And somebody had twenty-five before is going to get twenty-six or something like that. But when you're dealing with, you know, three or four social workers and one leave, now you say you recollect there were two left. That's why I ask the question about how significant was this added load, and how did you manage that as a clinical manager? In other words, did you help people schedule, did you direct them. They still had to do their visit once a month, right?

A: Right.

Q: Did you ask them at some point that it was difficult or impossible for them to do their job?

A: Based on the numbers they had, no, they could've done it. Because when she inherited the other social worker's, that section, she said she

couldn't see him. I mean, she deliberately said she was going to see him, because she could not handle the workload. And I told her that she could at least see him, if you can't see him every month, at least make an attempt. She made no attempt to see him for several months, not one of them.

Q: How do you make an attempt to see them, if, if it's too much of a workload?

A: Her workload was not such that she could not at least see some of those patients.

Q: Did you ever go out in the field with her?

A: No I haven't. I have been out on a field before but not with her.

Q: Did you ever go out in the field with any social worker and if so, tell us so?

A: When I had them before.

Q: Tell us when. When was that?

A: When I first got them, not in the service lines, when I had them before.

Q: Before service lines.

A: Right.

Q: Who did you go out in the field with?

A: It was their supervisor, he's gone now,

BEULAH HADRICK

1  I can't remember his name.  He was in charge of
2  the program.  I can't remember his name right
3  off.
4      Q:  Tell us about that visit in the field.
5  Tell us what you did, what you learned.
6      A:  We went to out to see the veterans in
7  several homes.  Actually we went out several days
8  to see their homes.  They opened up a new area;
9  we went out there to see that.  We met with the
10  veterans and talked to the sponsors.
11      Q:  How many years was that before Sammi
12  Wright was assigned to you?
13      A:  Probably about, see, maybe two.
14      Q:  Two years?  Now once Sammi Wright was
15  assigned to you and she complained that according
16  to you, she complained that she couldn't get this
17  job done.  Did you bring her in a counselor?
18      A:  We met with Sammi and asked her why she
19  wasn't seeing the patient.  She said because of
20  the workload.  Yet, and still on some days, she
21  did not have anything documented so she wasn't
22  seeing the patients she had to see.  So she might
23  have had one or two patients.  So if it was so
24  impossible, I mean, for two patients a day?  I'm
25  using two for a number.  Because that's how we

1  knew what her workload is, was, at that time.
2      Q:  Who was "we", you used the pronoun we?
3      A:  Well, with Lola Bell Scott.
4      Q:  Tell us, in other words, I'm trying to
5  understand.  You went out in the field.
6      A:  No, I didn't.
7      Q:  I assume in fairness to you what your
8  saying is; there was no need to go out in the
9  field.  You were trying to look at was what
10  scheduled and where she went.
11      A:  Correct.
12      Q:  So in fairness to you I assume you are
13  going to... your view would be "I was trying to
14  look at where she was visiting and what she was
15  doing and how frequently she was visiting",
16  right?
17      A:  Right.
18      Q:  And you are telling us that when you did
19  that, it's your recollection that Sammi Wright
20  was not, I guess even doing work with her basic
21  complement before the add-ons, is that fair to
22  say?
23      A:  You could say that.
24      Q:  All right.  When did you first discover
25  that she wasn't even going out in the field and

1  wasn't even doing any of these visits?
2      A:  I didn't say that she wasn't going out
3  completely, she was saying some patients.  I am
4  saying the load she was seeing, she could have
5  seen more with the load she was seeing.  She
6  would make out a schedule.  Actually we asked her
7  to start writing the schedule as to where she was
8  going and how many patients she was seeing in her
9  patients.  And before that we were looking at the
10  documentation as to how many patients were being
11  seen that day.
12      Q:  So you and Lola Bell sat down and you
13  looked at her productivity.  You look at what she
14  had been doing, how many visits she had been
15  making and where and that sort of thing, actually
16  before you sat down and asked her to fill out a
17  schedule.
18      A:  Right.
19      Q:  And you came to the conclusion that
20  there were days that she wasn't visiting anybody.
21      A:  No, I didn't say that.
22      Q:  I'm sorry I may have misunderstood you.
23  I thought you had indicated that there were days
24  when she had no, I think you said no
25  documentation.

1      A:  Right.
2      Q:  Tell me the difference between no
3  documentation and no visits.  In other words, let
4  me lay a foundation for that question this way.
5  Was there a requirement to document visits to
6  veterans?
7      A:  Correct.
8      Q:  Is there a certain form or something
9  that that goes on?
10      A:  No, it goes into medical records. We can
11  pull them up at any time and look at them and see
12  who was seen.
13      Q:  So, it is, that visit is posted to the
14  client's medical record.
15      A:  And it may not be that day if you have a
16  lot of patients that day, maybe the next day.
17  Somewhere in that time, even within a month's
18  period of time, you're going to have to something
19  in there.
20      Q:  Sooner or later is going to be posted.
21      A:  Right.
22      Q:  Sammi Wright, your best recollection, is
23  that Sammi Wright did not have documentation for
24  days, certain days.  Did you ask her to produce
25  that documentation or produce proof that she had

BEULAH HADRICK

1  done those visits?
2      A:  We asked her she had seen the patients.
3      Q:  What was her response.
4      A:  She said "no".
5      Q:  Did you ask her what she was doing on
6  those days?
7      A:  She said she was seeing patients.
8      Q:  OK, I'm confused.  You asked her if she
9  was seeing patients, but she had no
10 documentation.
11     A:  On the patients we had assigned her, she
12 hadn't seen them for months.  We got several
13 calls asking where the social worker was.  And I
14 don't remember who called at that point.  And I
15 asked her why she wasn't seeing the patients she
16 said she couldn't see them because of the
17 workload.  And we make it work that at least try
18 to see some of them.  If you can't see all them,
19 at least see some of them.  I mean this was a
20 period of months.  You can't see all of them, at
21 least see some of them.
22     Q:  OK, to me, it sounds as if, you have
23 attempted to have Sammi Wright explain or show
24 evidence that she had done visits on certain
25 days.  Did you do that?  Is that correct?

1      A:  Yes.
2      Q:  And if I understand your responses,
3  you're testifying that she could not produce
4  documentation or admitted that she wasn't doing
5  these visits.
6      A:  She admitted she wasn't doing them.
7      Q:  And again, if understand your testimony
8  correctly, correct me if I'm wrong.  She admitted
9  she just wasn't, some days she wasn't doing any
10 of the visits.
11     A:  She did not directly admit that to me,
12 no.
13     Q:  Well what explanation did she give you
14 for not doing visits on certain days, you know, I
15 don't know how these people are supposed to work,
16 I don't know if they're supposed to do computer
17 work or office time, I don't know if they're
18 supposed to be in the field everyday.
19     A:  They have office time, and they schedule
20 those patients to see them at least once a month.
21 How they do that, whatever day, that's on them,
22 they're professionals.  They should be
23 professional enough to do that.  So no, I don't
24 sit down and say, "you have to see Mrs. Smith
25 today and Mr. So and So"; they make their own

1  schedule up.  They have to see all of those
2  patients.
3      Q:  Sammi Wright had a stubborn of that
4  attitude, is that right?  Is that part of the
5  problem?
6      A:  That's part of our problem.
7      Q:  And she told you that she was not going
8  to able to visit these people because she just
9  flat couldn't do it, because of the workload?
10     A:  Right.
11     Q:  All right.  And you called some of the
12 places where Sammi Wright had told you she had
13 done visits but didn't have documentation, is
14 that correct?
15     A:  I didn't say that.
16     Q:  No, I know you didn't say that, I'm
17 asking you if that's correct.  Now, I'm not
18 saying you said that, you certainly did not.  I
19 agree with you, you did not say that.  I'm asking
20 you a question.  The question is, did you call
21 places where Sammi Wright said she had visited
22 patients, clients and seeing she did not have
23 documentations to that.  Did you call there to
24 ask if she had made visits?
25     A:  The patients we called, and I think

1  there were like two of them, and I don't recall
2  the particulars, they said they hadn't see her in
3  a long time.
4      Q:  The reason I asked you that question is
5  that I gave your attorney copies of a couple
6  affidavits or letters, I know they were given to
7  you in the prior litigation that I will be asking
8  you about in a few minutes.  But, those people
9  according to the notes they wrote that I saw
10 indicated that Sammi Wright add they were very
11 happy with her obviously, they liked her, they
12 respected, that's pretty clear from what they
13 said.  But they also indicated that she had come
14 and visited them.  Do you agree with me according
15 to at least what they said?
16     A:  We received copies of the letters also,
17 prior to receiving the letters.  They had said per
18 phone conversation that they had not seen her.
19 After we had told Sammi that, then the letters
20 appeared.
21     Q:  Yes, I agree with you that's my
22 understanding... let's talk about it a little
23 bit.  Let me ask you a few questions about that.
24 Beulah, you had called these people, my
25 understanding is that you had called these people

BEULAH HADRICK

SHEET 13  PAGE 49

PAGE 50

| | |
|---|---|
| 1 personally. Am I correct? | 1 do this or something like that"? |
| 2     A: I did not call. I called one of them | 2     **A: Well I thought about it, yes, because** |
| 3 and I think Lola Bell called the other. | 3 **they were both the same, I mean we didn't ask for** |
| 4     Q: My understanding is if I'm not wrong, | 4 **the letters, how would they know my name? I** |
| 5 you were present when both of them were called. | 5 **mean, you're going to remember a conversation** |
| 6     **A: Right.** | 6 **back when and they were addressed directly to me.** |
| 7     Q: Now, are you telling us that what these | 7     Q: So, you suspected that Sammi Wright had |
| 8 people told you in the phone call was | 8 called them and said, "hey, write Beulah a letter |
| 9 significantly different than what they wrote in | 9 or write this lady and tell her that I was out |
| 10 the letter? | 10 here and did my job" or something to that effect. |
| 11     **A: Exactly. That's correct, because I was** | 11     **A: I don't know if she called or what** |
| 12 **surprised to get the letters after what they had** | 12 **happened, I just say that it's suspicious that** |
| 13 **said on the phone.** | 13 **the letters appeared.** |
| 14     Q: Yes ma'm in other words when the letter | 14     Q: I agree with you. Your testimony and |
| 15 arrived, the letters arrive, those letters were | 15 these letters are a fact difference that raised |
| 16 at variance. They were very, very much different | 16 questions in my mind how that occurred or what |
| 17 from what these people have told you. | 17 occurred. I don't know. That's what I'm going |
| 18     **A: They were, exactly, you're right.** | 18 to try to get to the bottom of it. Once you got |
| 19     Q: Did you suspect that Sammi Wright, | 19 the letter, did you make any effort to find out |
| 20 suspect, I'm not saying you have any proof. I'm | 20 if Sammi Wright had tried to influence these |
| 21 going to ask you if you did any investigation. | 21 people to help her or to give you information to |
| 22 I'm trying to put myself into your mind, into | 22 affect your judgment? |
| 23 your shoes. Did you suspect that Sammi Wright | 23     **A: No I didn't ask for anything.** |
| 24 had contacted these people and solicited these | 24     Q: Why didn't you investigate? Why didn't |
| 25 letters, in other words, "hey, do me a favor, hey | 25 you ask someone, check in and see if these |

PAGE 51

PAGE 52

| | |
|---|---|
| 1 letters were solicited, if they were accurate or | 1     Q: And by the way, I sympathize; I am one |
| 2 why there was a difference between what these | 2 of those people if you ask me at a certain day |
| 3 people told you on the telephone and the letter | 3 and a certain time. There's people that know, |
| 4 that they wrote you? | 4 and there's people that, I'm one of those, I'm |
| 5     **A: Well I didn't feel there was a need. I** | 5 not... We're not here to be unfair to you. I'm |
| 6 **had already talked to them on the phone and these** | 6 trying to learn what you know. |
| 7 **letters just appeared. Why would I call back to** | 7     **A: I understand.** |
| 8 **find out when I already spoke to them and all of** | 8     Q: Beulah, do you know whether Lola Bell |
| 9 **a sudden letters appears basically the same stuff** | 9 kept any records of the phone call that you made |
| 10 **on both of them?** | 10 or she made with you. |
| 11     Q: All right. Now, at the time that you | 11     **A: Yes, I'm more than sure that we made** |
| 12 had called those people, did you just call a | 12 **reports of contact. We just automatically do** |
| 13 couple of people or did you call more? | 13 **that, not just for stuff like that.** |
| 14     **A: I know it was those two, I don't** | 14     Q: Do you have those records? |
| 15 **remember.** | 15     **A: I didn't bring them with me, but I'm** |
| 16     Q: Do you remember Beulah how many people | 16 **pretty sure.** |
| 17 you called? | 17     Q: Could you try to get them? And if you |
| 18     **A: No right off, it was those two, I can't** | 18 do that, I'll get a formal request, would you get |
| 19 **remember, that's been a year and a half. I had** | 19 them to your attorney? We'll probably suspend |
| 20 **more than Sammi.** | 20 for just five minutes, OK? |
| 21     Q: I know, I understand. | 21     Video Operator: It's 11:12 AM August |
| 22     **A: I mean, you just don't realize the** | 22 1,2002, we're suspending. |
| 23 **magnitude of the program I had, just to remember** | 23     Video Operator: The time is 11:29 AM, |
| 24 **all these minute details. I know they're** | 24 August 1,2002, we're resuming the deposition of |
| 25 **important to you, but I just can't remember.** | 25 Beulah Hadrick. |

BEULAH HADRICK

1   Q: Who was the other, I know there was at
2   least two. Who is the other social worker?
3   A: I could not think of his name. It will
4   come to me... Greg Ratkoff.
5   Q: Greg Ratkoff, do you remember him?
6   A: Yes.
7   Q: Now my understanding that Greg did some
8   kind of transfer or change?
9   A: He went to, I think back to mental
10  health.
11  Q: So he went from residential back to
12  mental health?
13  A: Right.
14  Q: Now, Beulah, do you remember why he did
15  that?
16  A: He didn't say?
17  Q: Did you ask him?
18  A: No, he just said he wanted to go back to
19  mental health.
20  Q: Who authorize him to go back to mental
21  health? He doesn't have the right to just do
22  that.
23  A: Well there was a position, and they
24  selected him and they can transfer back, if he
25  applies for a position and get accepted.

1   Q: Is that what occurred, do you remember?
2   A: Yes.
3   Q: Well, you now have one social worker.
4   A: No actually I had one and a half because
5   he had to do his job until we fill that position,
6   so it wasn't just that he left. He had accepted
7   for the position. And until we got one and
8   recruited, and actually after we got her, he had
9   to do some orientation with her, so that was an
10  agreement when we let him go.
11  Q: Now, when you were making the telephone
12  calls on Sammi, what was Greg's status, were you
13  at one and a half, were you at Greg was there?
14  Greg was half way there training somebody else?
15  You had a new recruit in there; you had nobody,
16  what was your situation?
17  A: I don't know. I really can't remember if
18  he was gone then or after that. I can't
19  remember.
20  Q: Now, at the time that you made the phone
21  calls, aside from Greg and Sammi, do you have a
22  recollection of at least there being some other
23  person being there or was it just Greg and Sammi?
24  A: It was just Greg and Sammi.
25  Q: So, Greg and Sammi were doing what you

1   believe at least three, possibly four people were
2   doing before, but you're not sure.
3   A: Yes, I'm not sure.
4   Q: I'm going to anticipate an objection
5   from your attorney on this. Let me ask you
6   anyway and see if we can work this out. Is there
7   some reason you can think of today why you can't
8   recollect where the workload plate of problem
9   under these kinds of conditions?
10  A: That she didn't see the patients?
11  Q: Sure, because, you had three or four
12  people. But you're not sure if you had three or
13  four.
14  A: I had three.
15  Q: All right, you had three. So one leaves
16  now you're stuck with two. Sammi's complaining
17  she can't handle the additional workload; she has
18  a bad attitude based on your recollection. She
19  was rather firm. But your recollection is that
20  she has a bad attitude, and did Greg ever
21  complain about the workload.
22  A: They asked when we were going to get
23  another social worker, I mean you can't just go
24  out and get a social worker like that. You have
25  to recruit, interview and hire. So they knew at

1   some point we were getting another social worker.
2   But at some point he asked too, and I don't
3   remember the exact..."are we getting another
4   social worker?"
5   Q: Did he come to you and ask you that?
6   A: No we had meetings.
7   Q: Did you ask him why he asked? I'm
8   assuming you knew probably.
9   A: Oh I knew why he asked, because he has
10  to fill that position.
11  Q: How long Beulah did this process or
12  period of time go on when these two social
13  workers are asking are we going to get another
14  social worker, are we going to get some help?
15  A: I don't remember the time frame; maybe
16  it went on for a couple of months. I don't know
17  the exact time frame.
18  Q: How long was this period of time that
19  Sammi was not seeing these people? Was it six
20  months, eight, ten, four, three, two, one. You
21  know, how long was she not seeing these people?
22  A: It was several.
23  Q: Several. Several is a word that means,
24  you know, it could be three, it could be five, it
25  could be four.

BEULAH HADRICK

1   A: It was anywhere between four to six
2   months maybe. I don't know the exact time frame,
3   but I know they weren't being seen.
4   Q: Did you have Sammi investigated?
5   A: What do you mean investigated?
6   Q: Aside from what you did, you made some
7   phone calls. Did you have Beulah do any checking
8   up or investigating into what Sammi was doing?
9   A: Lola Bell?
10   Q: Pardon me?
11   A: Did I have Lola Bell, you said Beulah.
12   Q: I'm sorry Beulah. Let's try to
13   straighten something out. Help me out with this,
14   Sammi testified, one of your attorney asked at
15   one point, I objected to this question, why Sammi
16   Wright did not sue Lola Bell. I objected to that
17   question. Now, your attorney then asked a number
18   of questions, it stayed in my mind because she
19   sees something she's going to pick up on it. To
20   which Sammi Wright, and invite her to comment on
21   my recollection on this testimony because it's
22   just my recollection, you weren't there. Sammi
23   Wright had testified that she felt you were the
24   progenitor and the leader of doing those things
25   and that Lola Bell really was not that out front,

1   she was more or less just doing what she was told
2   to do. That was her viewpoint. That Lola Bell
3   was not, that it did not originate with Lola
4   Bell, that it was you who was behind it. We say
5   behind this, we mean, these allegations of
6   mistreating her of course, her allegations of her
7   complaint. My question is this. Let's talk about
8   Lola Bell for a minute. Did Lola Bell come to
9   you at some point to complain to you about Sammi
10   Wright?
11   A: Yes.
12   Q: What did she say?
13   A: Well, I had her check in to see if the
14   patients were being seen. That's part of her
15   responsibility, to make sure that the patients
16   are being seen, so that's all how it came about.
17   Q: What specifically did you have her do?
18   A: Well, see, periodically she would do
19   spot check to see if they were documenting, if
20   the patients were being seen based on a
21   documentation and general stuff like that.
22   Q: Beulah, before you had Lola Bell do
23   that. I am assuming that you told Lola Bell to
24   do that, then Lola Bell came to you and said,
25   "Sammi is not seeing this...", is that right?

1   A: Right.
2   Q: So the process started in your testimony
3   I assume innocently just as a part of your
4   managerial or supervisory duties told Lola Bell
5   to check on whether these people were being seen,
6   right?
7   A: Right.
8   Q: Now, Lola Bell gets back to you Sammi
9   she is not seeing - right?
10   A: Right.
11   Q: Did she bring Sammi in for a conference
12   or a consultation, with you at some point?
13   A: Well we had so many meetings.
14   Q: With Sammi?
15   A: Yes.
16   Q: And how did Sammi seem to be with those
17   meetings?
18   A: Hostile and aggressive.
19   Q: OK. Can you tell us when or about in
20   time those meetings took place?
21   A: It's the time that she got those
22   patients from the other social worker, I think it
23   was about that time, and I think it was, sometime
24   in 2000-2001, I can't remember the exact dates.
25   Q: Now before that you hadn't had much

1   personal contact with Sammi Wright, right?
2   A: No.
3   Q: Why didn't you just tell Beulah...
4   A: Lola Bell.
5   Q: I'm sorry tell Lola Bell, "Lola Bell, go
6   get this done, go get that done, have her get
7   this done". You know, is there some reason why
8   Lola Bell comes to you? You say "hey look, this
9   has got to be done, go out there and you know get
10   this problem solved and get it done". Instead
11   you took on a personal management of it. There's
12   some reason why.
13   A: It's not unusual because I do it in any
14   cases that problems keep propping up. But I am
15   clinical manager for over site.
16   Q: That's your management site?
17   A: Right.
18   Q: Now, let the written record show.
19   Video Operator: The video obviously will
20   demonstrate.
21   Q: You're an African-American, correct?
22   A: Right.
23   Q: All right, we'll make a little diversion
24   here, and I want to talk about race. OK? Now,
25   Sammi Wright is not on camera, but Sammi Wright

BEULAH HADRICK

1  of where it is now. Now, from reading the
2  complaint, I will be a little more specific.
3  Paragraph 15 Sammi Wright says, perhaps paragraph
4  14, "this place plaintiff under the supervision
5  of Mrs. Hadrick and Mr. Shreve among others. 15,
6  " Since that time is a black person the plaintiff
7  has been treated in an unjust, cruel, disparate
8  fashion, in a concerted effort to create a
9  progressive disciplinary record so that the
10  defendants can force her to resign or terminate
11  her". Now just on that paragraph, just on the
12  issue of race. Are there any facts known to you
13  that indicate that Sammi Wright suffered
14  different treatment or harassment on account of
15  her race while she worked at Lebanon hospital?
16      A:  Under my area, that's all I can attest
17  to, I don't know anything about what happened in
18  mental health, like I said, I have enough of my
19  own area, no.  Because I am an African-American
20  so why would I treat her differently?
21      Q:  African-Americans can mistreat African-
22  Americans, it's not rare, I can tell you.
23      A:  That's true.
24      Q:  That's not the issue here, the issue
25  here is, your answer then is, based upon your

1  recollection, your experiences, what your saying
2  is, Sammi Wright while she was under your
3  supervision was not mistreated on account of
4  race.
5      A:  No.
6      Q:  Now, let me ask you about Greg.  Was
7  Greg's proficiency ever investigated or reviewed
8  by you?
9      A:  Yes.
10      Q:  Tell me what you did to review Greg's
11  proficiency.
12      A:  We did the same thing.  We asked him to
13  make out his schedule, we would check his
14  schedule, check his documentation with the
15  patients he said he saw. So we weren't treating
16  him any differently.
17      Q:  Did you call, do you have occasion to
18  call any of the vendors, or any of the sponsors
19  that dealt with some of the clients in his case,
20  in this particular circumstances.
21      A:  No, we didn't have a reason to.
22      Q:  You didn't have a reason to.  So, what
23  you're telling is that the reason you made those
24  calls is that, number one I think you indicated
25  you actually had complaints from the field?

1      A:  Right.
2      Q:  And those would be documented in the
3  records, right?
4      A:  We would have a report of contact
5  probably on them.
6      Q:  Do you remember seeing reports or
7  contact or you just told that?
8      A:  No we would make, if we get calls, if I
9  would get something or Lola Bell, usually,
10  typically she would write a report of contact.
11      Q:  But you're sure there are, there were
12  reports of contact that were prepared, that are
13  in some of these files somewhere.
14      A:  I didn't say I was sure, I said I would
15  look into it.  I'm more than sure we have some.
16      Q:  You're more than sure you have some.
17  OK, would you please try to find them.
18      A:  Yes, I have a note to do that.
19      Q:  Now, is that why you called those two
20  places?  In other words, did you call those two
21  places that you did call, you recollect calling
22  two places, right?
23      A:  Yes.
24      Q:  That you were either present at or you
25  made one.  You placed one call, Lola Bell placed

1  another call and you were present to place that
2  call.  But there are two calls.  Do you have a
3  recollection of placing those calls based upon
4  complaints from somebody at those places?
5      A:  I can't remember the specifics, but
6  there probably was a reason why we called, we
7  wouldn't just single those people out, but at
8  that time, I can't remember the specifics as to
9  why we called.
10      Q:  At this time you can not...
11      A:  No, I can't...
12      Q:  You can't recollect the reason, but
13  you...
14      A:  We obviously had something otherwise we
15  wouldn't have called.
16      Q:  Now, did you ever at some time bring
17  Sammi Wright into your office and sit down and
18  counsel her on what she needed to do to complete
19  her job assignment and fulfill her employment
20  duties.
21      A:  Yes.
22      Q:  And who was present with you when you
23  did that.
24      A:  Lola Bell, probably.
25      Q:  Lola Bell was present, is that correct?

BEULAH HADRICK

SHEET 18  PAGE 69

1    A:  Yes.

2    Q:  Did you make any notes of that meeting?

3    A:  On my head, I can't remember.  Like I

4  said we met with Sammi several times, it just

5  wasn't one or two times.  So, we should have

6  something.

7    Q:  OK.

8    A:  I'm not saying for sure, but I mean we

9  met lots of times.

10   Q:  Number of times you've alluded to

11 numerous meetings, can you quantify for us how

12 many meetings there may have been?

13   A:  No I can't quantify them all.  All I can

14 say, I met with her several times, we would

15 address issues with her.  She would either get

16 hostile, would just turn her back, would not even

17 acknowledge us being there, or, say "is that

18 all?", I'll say yes, and I would giver her

19 something, "do you want to sign?" , "no I don't

20 want to sign", I just document she refuses to

21 sign, then she would get up and leave.

22   Q:  What did you want her to sign?

23   A:  Well, it was you know, one of them may

24 have been a counseling informing her to see the

25 patient, you know, you will see, stuff like that.

PAGE 70

1  Whatever I have in the file and you know, she'll

2  leave, she'd never sign anything, so I'll always

3  put refuses to sign.

4    Q:  So you have a Sammi Wright file, I

5  assume you have an employee file?  Or if need

6  be... Did you ever tape record any meetings?

7    A:  I don't remember taping any.

8    Q:  Well, if you did, or if you recollect

9  taping any, would you check and see if you have

10 any?

11   A:  No we never typically tape, so I don't

12 have any tapes.

13   Q:  By the way, I'm not asking because it's

14 based on something, I'm just looking as a general

15 question.

16   A:  No, we basically never taped.

17   Q:  I don't want to imply that there is a

18 reason to, please don't be mislead.  At all the

19 meetings that you had, was Lola Bell present?

20   A:  Yes.

21   Q:  And, where did those meetings take

22 place?

23   A:  Usually in the conference room or in the

24 office.

25   Q:  Give me just thirty seconds I'm going to

PAGE 71

1  change the tape, OK?

2    A:  OK.

3    Q:  Thanks.  Beulah, the meetings now, where

4  did the meetings take place?  In the conference

5  room you said?

6    A:  Yes, in one of our conference rooms or

7  in the office.

8    Q:  Can I ask you to quantify you said you

9  couldn't.  But is there some way, like half a

10 dozen times, a dozen times.

11   A:  About half a dozen times.

12   Q:  So less than a dozen times, maybe.

13   A:  Maybe.

14   Q:  Did you ask anyone to watch Sammi?

15   A:  Watch her?

16   Q:  Yes.  Just observe her on the job, I'm

17 not implying to the sense that somebody spying

18 her home, but did ask anybody to watch her or

19 observe her?

20   A:  No.

21   Q:  Did Lola Bell Scott came in and testify

22 that she was asked to watch her and observe her

23 time and time habits, is there any...

24   A:  Oh time habits, what time she comes in?

25   Q:  Yes.

PAGE 72

1    A:  Yes.

2    Q:  OK, what else did you have her watch?

3  Like, well, take the word "watch" out and just

4  use the word "observe".  What did you have, what

5  information did you ask Lola Bell Scott or anyone

6  else to keep, collect, or watch or observe about

7  Sammi Wright?

8    A:  Well when Lola Bell was in the area, to

9  observe what time she comes in.  I mean, because

10 we never knew what time she came in, when she

11 left, that's why the schedule came about.

12 Because we would ask her, you know  to provide

13 times of the patients and times where she was

14 going, she would never that.  We never did

15 accountability as to where she was, we never knew

16 what patient she was seeing, that's why we asked

17 for the schedule at that time.

18   Q:  Didn't you say she was a professional

19 and you know, she could be trusted to do those

20 things? Well what did you do with Greg?  Did you

21 have Greg...

22   A:  We had Greg do the same thing.

23   Q:  You had him account for his time?  Did

24 Greg ever say to you or say to anybody to your

25 knowledge that you know, "I don't want to put up

BEULAH HADRICK

1  with this, I can't put up with this, I'm going to
2  leave", or anything like that?
3      A:  He may have said it, I mean...
4      Q:  No, don't speculate.  Do you know if he
5  said it?
6      A:  No, I don't if he said it or not.
7      Q:  So you're saying you did the same things
8  with Greg that you did with Sammi.  How did Greg
9  react to it?
10     A:  He filled out his schedule, the patients
11 where he was supposed to be going, it was on
12 there, a lot of times we would ask Sammi to do
13 the same, she would put them on there, cross them
14 out and say she had to see Mrs. So and so, so we
15 still never could keep up with her time.  The
16 patients she would have down on there, she would
17 come back and cross them off, the schedule was a
18 mess, we could never, ultimately our
19 responsibility is to have accountability as to
20 where they are.  And we didn't have that with
21 her.
22     Q:  Do you remember what the caseload was?
23 How many people she was supposed to see in a
24 month?
25     A:  No, I remember I told you I don't

PAGE 74

1  remember.
2      Q:  You have even a rough idea?
3      A:  No, I probably would have it in a record
4  somewhere, but basically, like I said I had more
5  than Sammi to contend with.
6      Q:  Yes, ma'm but you had a contingent or a
7  rough population of residential clients, right?
8  What was that number?
9      A:  It may have been 200 and something, 300
10 I really...
11     Q:  At some point Sammi was to see a hundred
12 clients in a month?  I want to assume a lot of
13 these clients would be at the same place more
14 than one would be, for example, at one particular
15 place, there might be one, two, three, four,
16 five.
17     A:  Five of them at a group home.
18     Q:  Five in a group home.  OK, well if she's
19 going to see a hundred, that's twenty in a month,
20 is that right?  I mean she's going to see a
21 hundred, excuse me, and there's a five in a
22 group, that's at least twenty different locations
23 in a month, is that right?
24     A:  Right.
25     Q:  How much time is recommended if there

PAGE 75

1  was any limit to spend with each letter?
2      A:  We don't dictate to them the amount of
3  time they're supposed to spend out there, these
4  people are professionals, I mean, we don't micro
5  manage to say, "you're supposed to see fifteen
6  minutes and stay with Mrs. Smith, ten minutes
7  with Mr. Jones".
8      Q:  Did you ever get any feedback from
9  these social workers that time that needed to be
10 spent with these veterans, at least a rough idea
11 to service them and to do a proper job for that?
12     A:  No.
13     Q:  All right.  I mean if the idea is to
14 serve the client, I realize, there is, are there
15 any parameters, regulations or recommendations
16 which suggest how much time might be spent in an
17 interview. First of all, is there anything like
18 that?
19     A:  No, there's nothing like that throughout
20 the VA system.
21     Q:  Are there any kinds of structured or
22 formal questionnaires or questions that will be
23 asked?
24     A:  No.
25     Q:  Is there any specific information that

PAGE 76

1  is to be gathered, I mean about clients, specific
2  information, nature of ailment, how's your food,
3  how's you med, how's schedule, how's discipline,
4  whatever?
5      A:  Basically those questions, how are your
6  meds, are you having any problems, appointments,
7  stuff like that.  Any problems in the home, but
8  there's no guidelines as to...
9      Q:  These guidelines are just developing
10 rapport with this client.  Is the client required
11 to meet with the social worker as a condition
12 receiving benefits?
13     A:  No, they're told that the social worker
14 will be going out there.
15     Q:  Well, are they told that the social
16 worker sets up an appointment to be there?
17     A:  The social worker might say I'm coming
18 back next month on Tuesday, but they don't say,
19 they don't have a specific time frame in that
20 month or day in that month that you're going to
21 see Mrs. Smith.
22     Q:  How many counties does Lebanon hospital,
23 it's a regional hospital isn't it?  Isn't it a
24 regional hospital?
25     A:  No.

BEULAH HADRICK

1  Q: Why not?
2  A: Because we didn't feel we had enough
3  people to do that, we were recruiting for one, it
4  wasn't like it was going on for a year.
5  Q: Well you said your testimony was Beulah
6  if I remember correctly, a few, and that came
7  down to four to six months, am I correct?
8  A: Right.
9  Q: That's what you said, so we're talking
10 four to six months. All right let me change
11 direction now and go back these meetings. You had
12 these meetings where, is it fair to say you felt
13 that Sammi Wright was insubordinate, that she was
14 disrespectful.
15 A: Yes.
16 Q: Now what did you do as a result of that?
17 A: Well we started off with counseling,
18 written, verbal, she had the opportunity to have
19 her union present each time, she refused to have
20 a union represent her. So we proceeded and we
21 told her each time we met with her and before we
22 got started, you have the right, and she always
23 refused, she didn't want a union present.
24 Q: Who was her business agent, or shop's or
25 whatever they call them there.

1  A: They can select anyone they want.
2  Q: OK.
3  A: They have several there and they can
4  select.
5  Q: So she can select. All right, who is
6  Szabo?
7  A: She is the director, the medical center
8  director.
9  Q: Now, that means she's the hospital
10 director, she's the head person.
11 A: Right.
12 Q: So, she's the top of the chain of
13 command.
14 A: That's correct.
15 Q: Did you have discussions with Ms. Szabo
16 about Sammi Wright?
17 A: Yes.
18 Q: Can you please tell us what
19 conversations you had with Ms. Szabo about Sammi
20 Wright?
21 A: Well, we just let her know, we would
22 meet with her frequently, each service line, and
23 they would go over issues, and any issues you
24 have and, actually not Ms. Szabo, it's the chief
25 of staff.

1  Q: Who was?
2  A: Zabogar.
3  Q: OK.
4  A: She's the chief of staff.
5  A: She's the chief of staff.
6  A: We'll have regular meetings with her.
7  Q: Now, tell me about meetings with Ms.
8  Szabo.
9  A: No, I'm sorry they were the chiefs of
10 staff, not Ms. Szabo. The chief of staff would
11 inform her of any issues in the service line.
12 Q: So you had not meetings with Ms. Szabo
13 at all?
14 A: We've may have had one meeting, a
15 couple, I can't remember the exact time. Just to
16 let her know the progress.
17 Q: With Sammi Wright.
18 A: Right.
19 Q: Let me ask you, how many other employees
20 you had meetings with Ms. Szabo?
21 A: Some of them was having issues if the
22 chief of staff say you need to let the director
23 know, or when we met with her, other than that.
24 Q: Give me a number.
25 A: Maybe about two or three.

1  Q: Two or three. What were their race?
2  A: Caucasian, I'm trying to think, we had a
3  black African-American, but I don't remember if
4  we discussed... it might have been resolved
5  before we got to me.
6  Q: Was that person a custodian?
7  A: No.
8  Q: Now, did you have any meetings with Mr.
9  Kent about Sammi Wright?
10 A: Yes.
11 Q: Tell me about those meetings.
12 A: Those are the meetings as to what form
13 of discipline in line with. If we would
14 recommend something, you know, he's more or less
15 the personnel adviser for disciplinary actions,
16 employee actions.
17 Q: Did you go to him and say, you know,
18 "we're having with Sammi Wright, tell me," how
19 did it start?
20 A: Yes, I would go to him and say we're
21 having these problems, you know, can we do this,
22 or what's our next step.
23 Q: Well, did you tell Sammi Wright what you
24 were going to do?
25 A: No.

BEULAH HADRICK

1  Q: OK, thank you. Beulah, did you ever
2  meet Mr. Kent without Lola Bell Scott present?
3  A: Yes.
4  Q: I'm sorry. I didn't complete the
5  question. Did you ever meet with Mr. Kent
6  without Lola Bell Scott present where you
7  discussed Sammi Wright?
8  A: Yes, I'm quite sure I have. Not
9  specifically for her, but it may have been
10  something that came up and I said, he may ask,
11  "are you all having any problems".
12  Q: Did you and Mr. Kent at any time discuss
13  progressive discipline?
14  A: Yes.
15  Q: Why did you do that? Let me tell you
16  where I'm going with this so you understand. I'm
17  trying to understand why you would discuss
18  progressive discipline if you didn't have a long-
19  range goal. Which I'm going to ask you about, to
20  get rid of Sammi or to force her out of that
21  position. And that's where I'm going. So write
22  the questions down. If you had discussed with
23  Mr. Kent about progressive discipline, now you
24  did indicate that that was connected to Sammi
25  Wright. But if you had discussions, then I

1  assume that it was. If you had discussions with
2  Mr. Kent about progressive discipline regarding
3  Sammi Wright, why did you have those discussions?
4  A: Well if we gave her, let's say a written
5  counseling, and she wasn't doing any better,
6  that's what progressive discipline is, the next
7  step down the line, now, is she doing any better,
8  is he doing any better, no, well then you go to
9  the next step. That's what how we define
10  progressive discipline. If you do want action
11  there's not a result of increase in change in
12  behavior, then you go to the next step. For
13  instance, if I'm not at work and I'm charged
14  AWOL, I may get a reprimand and next time I might
15  get the admonishment because I've been AWOL
16  before. That's progressive discipline at the VA.
17  Q: So what you're telling me is that when
18  an employee comes in, I mean, when for some
19  reason a counsel of an employee or what not, it
20  would be a normal procedure to discuss
21  progressive discipline in connection with that
22  employee and you did not single Sammi out in that
23  regard.
24  A: That's correct.
25  Q: Now, you've mentioned written reprimand.

1  How many write-ups did you give Sammi that you
2  can remember?
3  A: I think she had a written counseling she
4  may have had an admonishment or reprimand, I
5  don't remember which one, and a suspension.
6  Q: What where they were for?
7  A: They were for the same thing basically,
8  not seeing the patient, I can't remember the
9  specifics, but it was written on the counseling
10  as to what they were for.
11  Q: Did she suffer at some point a doc or
12  cut in pay?
13  A: When she was suspended. When you're
14  suspended, let's say for three days, you don't
15  get that pay. When you're AWOL, you don't get
16  that pay. That's absence without leave.
17  Q: Didn't you do that? Didn't you err on
18  that regard?
19  A: One of them, I think I did, I'm trying
20  to remember the circumstances behind it. The
21  problem with Sammi, we never knew where she was,
22  we gave her notice that as of this date, you are
23  to report in, where you're going, call back. The
24  particular time she got the AWOL, she didn't
25  report in, she didn't come in, nobody saw her, so

1  based on our findings from before, we told her
2  that she was going to be AWOL. I changed the
3  AWOL and that somebody called and found out that
4  she was in the hospital somewhere, so I took it
5  off.
6  Q: Hadn't she in fact reported those
7  things? Weren't they in fact, wasn't there a
8  miscommunication someone on the other end, in
9  other words, didn't you fail to investigate that
10  situation properly?
11  A: No I didn't.
12  Q: You did investigate it properly?
13  A: I didn't fail to investigate it. She
14  did not report in at the time she was supposed to
15  report in to say I'm going to Mr. Smith or
16  whatever. She was told from now on, because we
17  could never account for her. From now on you are
18  to report in the morning and where you're going.
19  And that didn't happen. At some point she
20  called, I can't remember the details, but we had
21  evidence to believe that she was somewhere in the
22  hospital, so we took it off. No I investigated.
23  She had instructions to, in the morning, report
24  that you're here.
25  Q: Did she get her money back?

BEULAH HADRICK

**PAGE 93**

1  A: If you take the AWOL off you do get it
2  back.
3  Q: For why of better description, she
4  prevailed, didn't she?
5  A: Oh yes, I'm not after to get the
6  employee. If you're given a set of instructions,
7  report here in the morning and let your
8  supervisor know where you're going, I'm here, and
9  then you fail to do that after you get the
10  instructions, and nobody sees you, she hadn't
11  reported in, you're AWOL. I'll do the same thing
12  for anybody else and I have done it.
13  Q: Sammi Wright irritated you, didn't she?
14  A: No more so than any other problems, I
15  just had more with Sammi. I had more of the same
16  thing with Sammi. That if she received the
17  counseling, she did not improve. That's why the
18  progressive discipline. She was deliberately
19  doing whatever we said what not to do.
20  Video Operator: It's 12:22, we need to
21  suspend.
22  Video Operator: Today's date is August
23  1,2002 it's now 12:33 PM and this is the
24  continued tape of deposition of witness Beulah
25  Hadrick of Sammi Wright case. The time is 12:33

**PAGE 94**

1  PM.
2  Q: I'm trying to think where we were.
3  Frye: My notes say that Mrs. Hadrick just
4  mentioned that she has docked other employees for
5  AWOL.
6  Q: And that everybody's been treated the
7  same way. Now, why did Sammi Wright prevail in
8  the dispute over her pay being dock?
9  A: We're trying to give the employees the
10  benefit of the doubt. I think we received the
11  call that she was in the hospital or had been, I
12  can't remember the exact incidence; in that case
13  I went ahead and changed it. But she still didn't
14  report in, which she was told so I actually
15  could've kept it.
16  Q: But out of compassion and kindness, you
17  didn't, is that what you're saying?
18  A: I would do the same thing for another
19  employee.
20  Q: Well, did she write to Senator Specter
21  complain about the situation out there?
22  A: I don't know, I heard that, I didn't
23  hear anything specifically about it.
24  Q: Who did you hear it from?
25  A: I don't know if it was Scott, I don't

**PAGE 95**

1  remember, I don't want to name names, because I
2  didn't see it, so I don't konw.
3  Q: Who's Scott, what Scott do you mean?
4  A: Shreve, Dr. Shreve.
5  Q: Did Dr. Shreve play any role in
6  disciplining Sammi?
7  A: No other than he signs off the paper
8  work to me.
9  Q: He signs off on the paper work?
10  A: Yes, usually it has to go from the chief
11  of the service through and ...
12  Q: Did you have any discussions with Scott
13  Shreve about this?
14  A: Yes.
15  Q: Tell me about those discussions.
16  A: It was the same discussions, you know,
17  she wasn't improving, she wasn't seeing the
18  patients.
19  Q: Why didn't you just dismiss her if she
20  wasn't seeing the patients, if she's not seeing
21  her patients or doing her job, isn't just cause
22  to dismiss her?
23  A: Yes, but we like to start off with
24  progressive discipline hoping that the employee
25  is going to improve.

**PAGE 96**

1  Q: Well, you already reached that level,
2  hadn't you?
3  A: Well, basically, yes.
4  Q: Yes you have, so it's your testimony
5  you're being kind, or good to her about this or
6  something?
7  A: Basically we do the same for another
8  employee; we just don't fire them unless it's
9  something really serious, like patient abuse or
10  injuring a patient.
11  Q: When you docked her pay, did you tell
12  her you were going to dock her pay?
13  A: She knew she was going to be AWOL.
14  Q: She knew she was going to be AWOL, what
15  does that mean, she knew she was going to be
16  AWOL.
17  A: Meaning that at same point, she was
18  told.
19  Q: I don't understand, at some point she
20  was told she was going to be AWOL?
21  A: Usually what we do before we give them
22  AWOL, if they're not there, we give them notice
23  that if you're not here at a certain point you're
24  going to be AWOL. It's common knowledge. It's
25  nothing new to Sammi, and nobody else. They know

BEULAH HADRICK

1  they're going to be able if they're not on a job.
2  We usually give them a warning, if you're not
3  here by a certain time; you're going to be AWOL.
4  You're not reporting to duty, you're going to be
5  AWOL for however long.  We do it in fifteen-
6  minute increments.
7      Q:  If you're not here you're going to be
8  AWOL.
9      A:  You know if you're not at a designated
10  place...
11     Q:  Sure, oh I understand.
12     A:  OK.
13     Q:  But OK, if you're not at the hospital by
14  3:00 you're going to be AWOL.  That's a direct
15  order, you're going to be here, or you're going
16  to be AWOL.  Now, at 3:00, you check or you call
17  somebody and they're not there, you put them down
18  as AWOL.  Now before you dock their pay, do you
19  call them up and say "look, you were not there at
20  3:00, you're going to get your pay deduct".. Is
21  that what you do?
22     A:  No, because we don't do...
23     Q:  You just dock them.
24     A:  We don't do it with any of our
25  employees.

1      Q:  So you just dock them and then they have
2  to get back and they have to show and demonstrate
3  that they were there.
4      A:  Right.
5      Q:  And Sammi came up with evidence that she
6  was there, right?
7      A:  Right.
8      Q:  Let's go back to Senator Specter.
9  Beulah are you telling us that nobody kept with
10  you on the congressional?  What is a
11  congressional?
12     A:  A congressional is, usually we get them
13  from patients, say for instance, a get a lot of
14  them and we're discharging them and they want to
15  stay in there, in the hospital, they write the
16  families or the patients will write their
17  congressman saying "hey you know, call them,
18  write them because we want to stay, on and on".
19  And the congressional is just that, we'll get a
20  congressional saying that Mr. Smith's family
21  saying he's staying there and they only want the
22  facts.  I'll write them back and say, "yes, he's
23  been here blah,blah,blah, and we have to
24  discharge him".
25     Q:  OK.

1      A:  Basically we answer to the congressional
2  as to what they're complaining about, the basis
3  of their complaint as to what we're doing,
4  usually for patients.
5      Q:  Now you're telling us that you didn't
6  know she wrote Senator Specter, right?
7      A:  I said I heard she wrote him, I did not
8  see...
9      Q:  Who did you hear it from?
10     A:  I don't remember the specific, it may
11  have been the director, it might have been Ray
12  Kent, I really don't want to say one or another
13  because I don't remember who said it, I just said
14  I didn't see it.
15     Q:  You don't know who you heard about any
16  inquiry from Senator Specter, right?
17     A:  Right.
18     Q:  When I was in the army, a congressional
19  came down with a big blue heavy cardboard cover
20  sheet that said "congressional" on it.  And when
21  we got a congressional, I mean, we jumped.  At
22  least the army did.  I don't know what the
23  veteran's administration does.  But you don't
24  have a recollection of ever seeing any documents
25  from a congressman or from Senator Specter, that

1  said "congressional" or that this is an
2  investigation.  No one ever called you up and
3  said, "we're doing an investigation on this"?
4      A:  Usually what happens, the congressional
5  will come in through the director's office, and
6  they log them in, I don't know what their system
7  is, I'm pretty sure they log them in because they
8  usually have a date up on, and usually the send
9  it to the area that the congressional is
10  inquiring about, like if it's a patient in my
11  area of mental health, I'll get it.  Usually I
12  have so many days to answer the congressional,
13  and then it goes back to the director, I'll send
14  my response to the director and she'll put a
15  cover letter, I don't know their system.
16     Q:  But Beulah, that's the point, you never
17  get any written response, answered any questions,
18  do you have any records or notations of anything
19  that comes from Senator Specter?
20     A:  Nope.
21     Q:  Once you know about this case today, can
22  you tell me why?
23     A:  I have no idea, like I said, they
24  usually they come through the director's office
25  and she'll forward them to wherever and I don't

BEULAH HADRICK

1  job, OK?  I'm not being condescending or
2  fictitious when I ask these questions, please,
3  we've all been to school, we know what it means,
4  I mean, was there any discussion with these
5  employees about why they were not allowed to have
6  a cover over the glass to their office?
7      A:  The other employees, one of the other
8  employees, did in fact object into it.  I told
9  them to take it down, first of all, yes they're
10 supposed to be professionals, but we couldn't
11 substantiate and have accountability as to where
12 she was at the time.  Why would we leave the
13 cover on the door?
14     Q:  Now, do you know whether Sammi Wright
15 was ever consulted about the removal of the
16 cover?
17     A:  I think she was told that it would be
18 coming off.
19     Q:  But she wasn't asked, or, she was just
20 told.
21     A:  No, right.
22     Q:  Was it Dr. Shreve who told her?
23     A:  No, I don't know who told her.  I don't
24 know who did.
25     Q:  Or was it you?

1      A:  I didn't directly tell her, I might have
2  told the group, OK, yes it will come down, I
3  don't remember, but yes, I told them it should
4  come down.
5      Q:  Paragraph 21 of the complaint, Beulah
6  Sammi Wright makes this allegation.  Don't
7  respond while I'm reading because I'm going to
8  ask questions a little bit differently.  Partly
9  because you've already answered parts of it, OK?
10 The torment and harassment this is what Sammi
11 Wright is alleging, what's happening to her,
12 includes having other staff and even third
13 persons watch and report on her and force to
14 follow demeaning reporting procedure that no
15 other employee has to follow.  Now, you've
16 already, the last sentence has to do with racism,
17 I think you've already answered those questions.
18 Is Sammi Wright correct in this allegation that
19 she was forced to follow reporting procedures
20 that no other employee had to follow.  I asked
21 you some questions about Greg and you've
22 answered...
23     A:  Right.
24     Q:  Was Greg required to do the same things
25 that Sammi Wright was?

1      A:  He was required to the same thing, to
2  have a schedule out as to where he was going, who
3  they were seeing.  Their reporting in is yes,
4  report in the morning to say "I'm here", it was
5  no different from anybody else.
6      Q:  Well, I understand that.  But were there
7  other things that Sammi had to do that Greg
8  didn't have to do?
9      A:  Not that I can recall most of them had
10 to sign and say where they were going and with
11 the schedule, he did his.
12     Q:  Now, does that mean that you don't have
13 a recollection of Sammi Wright being given more
14 stringent or greater reporting requirements and
15 restrictions than Greg?
16     A:  No, they were exactly the same.
17     Q:  I ask that as you recollect.
18     A:  Right.
19     Q:  OK.  In paragraph 26, on page 5 Sammi
20 Wright says that Beulah Hadrick has treated
21 plaintiff unlawfully docking her pay without
22 warning or notice and that action was approved
23 and upheld by Mr. Shreve and Ms. Szabo.  Let me
24 ask you a question about that allegation.  When I
25 had questioned you earlier, I got the impression

1  that Sammi came in, and somehow that indicated
2  that she was at the hospital or where she was
3  supposed to be and therefore you gave her the pay
4  back.  Was that the procedure that was followed
5  or was there some sort of hearing, or was there,
6  can you tell me what role Mr. Shreve, Dr. Shreve
7  as I understand, and I apologize, I call him Mr.
8  Shreve, and I should've put his title there, and
9  Ms. Szabo, what role they play in the docking of
10 pay, did they in fact.  Sammi Wright alleges that
11 the action to dock her pay was approved and
12 upheld.  My understanding is there was kind of
13 hearing of complaint process and that it was, and
14 that, maybe it wasn't upheld.
15     A:  No, there was not an investigation, it
16 was just decided and that's how it was.  There
17 was no formal nothing, she didn't have anything
18 to do with it.
19     Q:  To clear this allegation on these
20 points, and perhaps Sammi is in error here, or
21 perhaps I was in error in interpreting her facts
22 and graphing this complaint, but it's your
23 testimony here today that Dr. Shreve didn't know
24 that her pay was docked.
25     A:  No, not until I told him.

BEULAH HADRICK

1  Q: Well, did you tell him, did you ask his
2  OK, or say would it be all right if I docked her
3  pay?
4      A: No.
5  Q: You just did it.
6      A: I just did it.
7  Q: OK, and did you inform him that Sammi
8  pay has been docked before you returned it to
9  her, other words, tell him after the fact or did
10 you tell him, try to think back on this. Before
11 Sammi had asserted her right and you had changed
12 your mind.
13     A: No, he knew before hand.
14 Q: He knew before Sammi had said, "hey I
15 was at the hospital", right? How about Ms.
16 Szabo, did she know before hand?
17     A: She didn't even know about it, I don't
18 think.
19 Q: One way or another?
20     A: I mean, she didn't get involved in it.
21 Q: She found about it, you're telling, she
22 found out about it after the fact.
23     A: Yes.
24 Q: Now, do you know whether Sammi Wright
25 wrote more than one letter to Arlen Specter?

PAGE 114

1      A: I don't know, like I said I found out
2  about the first one after the fact, so I don't
3  know.
4  Q: As you sit here today, do you know
5  whether Mr. Kent composed the response to Arlen
6  Specter's inquiry?
7      A: Other than what you said, I don't know
8  who composed it.
9  Q: Did you ever get any communication from
10 anybody saying Senator Specter has made an
11 inquiry based on a complaint of one of our
12 employees about the treatment of veterans over
13 this new product line stuff?
14     A: All I heard, I just heard about the
15 letter, I never saw and I didn't have to respond
16 to it. So, based on the fact that the director
17 appoints and send the congressional to whatever
18 area she feels appropriate, maybe to Kent, I
19 don't know. That he is the HR specialist.
20 Q: Did Sammi Wright end up being terminated
21 or suspended at some point after that?
22     A: I don't know if it was after that, they
23 had to be after that.
24 Q: How did that happen, tell me what you
25 know about that.

PAGE 115

1      A: Based on the progressive discipline, I
2  think we gave her, like I said a reprimand
3  admonishment. I don't remember the suspension,
4  and then final termination.
5  Q: Well, what did she do, what did she do
6  wrong, you returned the equal pay, or the AWOL
7  pay, right? That was cleared up, so Sammi wasn't
8  wrong there, I'm going to assume that any paper
9  work connected with that was removed from file?
10 What did she next do wrong that led her to be
11 what, dismissed?
12     A: To be honest with you, I can't remember
13 the particulars, as to the final straw, I really
14 don't. It may have been a culmination, a lot of
15 times we base it on the culmination of all the
16 past. If something else came up, then that will
17 be the recommendation for the termination.
18 Q: Well Beulah, let me ask you this.
19 There's some written reprimands on her file, at
20 the point that you docked her pay for being AWOL,
21 right? Recognizing your error, and your
22 testimony here today, it has nothing to do with
23 Arlen Specter contacting the hospital to your
24 knowledge, you admit at least, you had admitted
25 to counter merit, so it couldn't have been

PAGE 116

1  because of Arlen Specter. You returned her pay.
2  Now, wouldn't that, that's not a progressive
3  discipline thing, because it got wiped out,
4  because she prevailed on it, right?
5      A: Yes.
6  Q: So now we're back to whatever happened
7  that she did wrong prior to when she was accused
8  of being AWOL for having her pay docked. Now,
9  aside from writing to Arlen Specter, I would
10 admit I can't find out what else she did wrong.
11 But that doesn't mean I know, I don't know, I
12 have to read these reports and stuff. Now, I'm
13 asking you, what you may know. I mean I don't
14 know. So, I'm asking you, what additional things
15 she did wrong that led to her termination. What,
16 what additional things after this, what
17 intervening events or acts after this led to her
18 being suspended?
19     A: I don't remember the key specifics, like
20 I said it's progressive discipline, it may have
21 been a culmination of these, I don't have it in
22 front of me, it's been a year and a half ago, I
23 don't remember.
24 Q: Well, there was a report, this is what
25 the VA did, OK? Apparently, she prevailed on

BEULAH HADRICK

1    somebody say to you Sammi Wright contacted Mr.
2    Buro?
3    A: Well because you hear that you know,
4    just in gossip, I mean it's just like a city.
5    You hear everything there, not knowing if it's
6    true, a lot of things you hear from the
7    housekeepers, I mean, so...
8    Q: Politics.
9    A: Yes.
10   Q: That source is everywhere.
11   A: Everywhere.
12   Q: OK now, if you heard that Mr. Buro had.
13   If you heard Sammi Wright just a rumor thing, you
14   don't remember from who, it could be from
15   anybody, contacted Mr. Buro. Mr. Buro is a
16   person who would make a, an inquiry as a veterans
17   advocate, right?
18   A: Right.
19   Q: And if somebody's mistreating veterans,
20   and I am not suggesting or implying that anybody
21   was mistreating veterans, OK, I'm not. If were
22   mistreating veterans, Mr. Buro's job is to get
23   that situation rectified or check it out, right?
24   A: He would check it out.
25   Q: And based upon your experience and

1    knowledge, Mr. Buro would probably contact the
2    director first, that would be the way to go.
3    A: Correct.
4    Q: That's the, that would respect the
5    system.
6    A: Chain of command.
7    Q: Chain of command. But as you sit here
8    today, aside from this rumor that you heard, you
9    have no independent facts to indicate that Mr.
10   Buro did or did not contact Ms. Szabo?
11   A: That's correct.
12   Q: Do you have it right now?
13   A: Yes you do.
14   Q: All right, now. That VISN, V-I-S-N,
15   function, did anyone ever contact you from that
16   particular enclave, that particular office or
17   whatever and ask you anything about the Sammi
18   Wright's complaint?
19   A: No, like I said it would've gone
20   directly to Ms. Szabo.
21   Q: Well Sammi Wright's, Sammi Wright's
22   deposition is not yet complete. I will tell you
23   that she will testify that she did in fact
24   contact Mr. Buro, Buro, that's hard for me
25   pronounce too, I'm not real good I guess at some

1    of these verbal skills. You ladies are far
2    superior at verbal skills. And do you know
3    whether Mr. Buro, how he does his contacting, he
4    uses telephones, e-mails.
5    A: Both, I would suppose, he usually calls
6    too.
7    Q: He calls also.
8    A: E-mails.
9    Q: He answers directly to the, the
10   veteran's director, the top person, right?
11   A: Washington, right.
12   Q: Is that Max Cleland at the time?
13   A: It was after that.
14   Q: Who is the head of the VA now, do you
15   know?
16   A: Starts with an "S".
17   Q: I'm sorry I don't. Buro's office is in
18   Philadelphia, and it's spelled B-U-R-O?
19   A: Buro.
20   Q: I'm sorry.
21   A: Buro.
22   Q: I think that's it Cathy.
23   Frye: Ms. Hadrick, how long did you
24   supervise or be the second hand supervisor for
25   Ms. Sammi Wright?

1    Hadrick: Maybe two years.
2    Frye: And, could you please explain to us
3    the circumstances surrounding the departure of
4    one social worker and informing the plaintiff
5    that she would have to pick up some of his
6    workload. Describe what happened.
7    A: Well we told her she would have to pick
8    up some of the caseload, and she said she could
9    not pick them up, didn't want to pick them up, it
10   went on for a couple of months.
11   Q: Did she say she refuse to see the
12   patients?
13   A: Yes.
14   Q: Did she admit that she was not seeing
15   the patients?
16   A: Yes, she said that she wasn't seeing
17   them because she could not see them because of
18   her workload. And we had told her to at least
19   try to see some of them and she didn't see those
20   either.
21   Q: For about how long did she not see those
22   patients?
23   A: Probably about four to six months
24   because we asked her to see them, I finally
25   ordered her to see them.

BEULAH HADRICK

1    Q: What did she do when you ordered her to
2  see them?
3    A: I sent her an e-mail saying, "you will
4  see the patients, this is a direct order".
5    Q: What did she do when you gave her a
6  direct order to see the patients?
7    A: I think she made contact one by phone,
8  but she might have seen one or two after that.
9    Q: Now the period of time when she was not
10  seeing these patients, can you recall when that
11  period of time was, approximately?
12    A: For about four to six months.
13    Q: This was the year 2000, year 1999?
14    A: Yes, this was 2000.
15    Q: OK, the beginning of 2000?
16    A: I can't remember when the social worker
17  left. We may have been three months into the
18  year.
19    Q: Three months into the year of 2000?
20    A: Yes, maybe.
21    Q: So this has occurred before Ms. Wright
22  wrote a letter to Arlen Specter?
23    A: Yes.
24    Q: OK. Did Ms. Wright have problems
25  getting along with co-workers?

1    A: Yes, she did.
2    Q: Can you describe what problems are?
3    A: Well staff would call in, I got a couple
4  of calls saying she was in primary care, I think
5  it was in the office, and for us to ask her to
6  leave out because that was the area and they did
7  not want to approach her.
8    Q: You mean she was in the parts of the VA
9  hospital?
10    A: Right, other than her office, using the
11  computer. And I think we asked her about it
12  once. And she was the computer was there, I
13  think it was primary care wherever the guy
14  called, and said, you know, they use the area and
15  asked her not to come and use the area.
16    Q: Did she ever have any other problems
17  with the other workers at the VA?
18    A: Well one of the, I was reading this and
19  I remember this case would the chaplain's
20  secretary with these pagers, she informed the
21  chaplain, who informed me that Sammi went over
22  and approached her and pointed her finger, now
23  this is from the secretary to our boss, and I got
24  it from him, pointed her finger in his
25  secretary's face saying, "don't you ever call

1  Beulah and let her know you can't reach me," and
2  on and on.
3    Q: Are you affirmed to the incident when
4  there were four pagers on June 12? OK. So when
5  the new social worker was hired to replace the
6  one who retired, how did Ms. Wright get along,
7  was that a female?
8    A: Yes that was a female.
9    Q: How did Ms. Wright get along with her?
10    A: Well she didn't say anything to her.
11  The social worker told me she wasn't friendly,
12  she would ask her something and she was short
13  with her. We never really assigned Sammi to
14  orient her, we got Greg.
15    Q: What did you have to do to orient the
16  new social worker?
17    A: Well we had Greg, the other social
18  worker that left to come back because that was
19  our agreement when moved him that he would orient
20  the new social worker.
21    Q: Now this was the social worker who had
22  arrived to pick up part of the workload, right?
23    A: Right.
24    Q: When the time you supervised Sammi
25  Wright, about how many people complained about

1  her to you?
2    A: I can't count the number. It was
3  several. They said she wasn't friendly; the main
4  complaint I would get was that she wasn't
5  answering her page.
6    Q: Who complained about that?
7    A: The secretaries or other staff that had
8  tried to call her.
9    Q: And what time period were those
10  complaints?
11    A: Well actually from the time she came
12  over to our area.
13    Q: So from the very beginning of when you
14  supervised her?
15    A: Yes.
16    Q: Did that problem ever improve, the
17  problem about not responding to?
18    A: No, it started to improve.
19    Q: It started to improve?
20    A: It wasn't totally improved but because
21  we gave her a phone, she had a cell phone, plus
22  she had a pager. Sometimes she would not answer
23  either one of them.
24    Q: Did the other social workers have any
25  difficulty seeing all of their patients?

BEULAH HADRICK

1    A: No.
2    Q: And they had workloads comparable to
3 Sammi Wright's?
4    A: Yes, Greg.
5    Q: They managed to...
6    A: He saw all of his, we told him he had to
7 see them, he saw all of his.
8    Q: Did the other social workers have any
9 trouble complying with the schedule and
10 documenting the assignments?
11    A: No, he would follow, he would put his
12 assignment on the sheet that we had and he would
13 notify us when he was leaving and we didn't have
14 any problems.
15    Q: Now Mr. Bailey asked you some questions
16 about progressive discipline.
17    Video Operator: Excuse me, could I suspend
18 and change my tape please?
19    Q: Sure.
20    Video Operator: The time is 2:49 PM and
21 we're going to suspend the deposition and tapes.
22    Video Operator: The time is 2:50 we're
23 resuming the deposition of Beulah Hadrick, August
24 1,2002, we're on the third tape.
25    Q: Ms. Hadrick, Mr. Bailey asked you some

1 questions about progressive discipline. What was
2 your goal in using progressive discipline with
3 respect to Sammi Wright?
4    A: Usually with any employee we use
5 progressive discipline to get them to improve.
6 You start off with a verbal, written, on and on,
7 in order to get them to improve.
8    Q: So essentially your goal is to have a
9 functioning, professional employee.
10    A: Right.
11    Q: Mr. Bailey also made several references
12 to the fact that the social workers are
13 professionals. Did Sammi Wright behave like a
14 professional?
15    A: No she didn't.
16    Q: Can you explain what she did that was
17 not professional?
18    Bailey: Objection, you may respond. That
19 may be subjection to attorney's personal record
20 and we got a response, I was just noting for the
21 record, by the way maybe objection is accepted in
22 the form of question from time to time.
23    Frye: Yes.
24    Bailey: OK.
25    Frye: Go ahead. The question was in what

1 way did she behave unprofessionally.
2    Hadrick: The other staff never did really
3 want to approach her because of her behavior.
4 Just hostile and aggressive, she always act like
5 she had a chip on her shoulder. That was their
6 comment.
7    Q: All right.
8    A: They never want to ask her anything.
9    Q: And what about the issue of being able
10 to reach her and knowing where she was, do you
11 consider her behavior in that regard
12 unprofessional?
13    A: Yes.
14    Q: And can you explain what was
15 unprofessional about it?
16    A: Well we gave her, you know it was just a
17 simple sheet where she had to sign and put her
18 patients down that she was going to see that day,
19 let us know when she was leaving and coming in,
20 she never did do that. That's not anything that
21 I don't expect from anybody else because I have
22 nurses that go out and they have to do the same
23 thing.
24    Q: How many people have you supervised over
25 your career?

1    A: At Lebanon I think it was a hundred and
2 ninety something, but over my career, gee... oh,
3 total maybe twelve hundred.
4    Q: Twelve hundred you said? As a person
5 you have supervised, how does Sammi Wright
6 measure up with twelve hundred people you've
7 supervised?
8    A: Well, I've never had anybody this
9 defiant. Saying they weren't seeing the
10 patients. Her attitude.
11    Q: You've never had anybody like her?
12    A: No.
13    Q: Would you have taken the disciplinary
14 action against her that you took even if she had
15 not written that letter to Senator Specter?
16    A: Yes.
17    Q: Would you have taken that action even if
18 she had not apparently called Mr. Buro?
19    A: Yes, and with any other employee.
20    Q: In retrospect, do you think the
21 disciplinary actions taken against Ms. Wright
22 while in your line, in your chain of command were
23 appropriate?
24    A: Yes.
25    Q: Would you do it again?

BEULAH HADRICK

1  A: I would do it again.

2  Q: That's all I have.

3  Bailey: Did you ever do any kind of report
4  documenting these failures to check on veterans,
5  you know, by the name veteran, or by the home
6  they were in or anything like that?

7  Hadrick: When we gave it to counseling it
8  was mentioned in there that she failed to.

9  Q: I understand that and you testified that
10 a number of times, I don't want to, I don't want
11 to just, I was just wondering if there was a
12 specific report or document where you say,
13 "Sammi, on such and such a date, you were told to
14 do this and you didn't do that. Or you
15 missed..." Something definitive that tells you
16 where she didn't go, what she didn't do? I have
17 seen e-mail with a direct, I'm interrupting, I'm
18 sorry.

19 **A: No, if you get a reprimand or a**
20 **counseling, it's usually there what you failed to**
21 **do. So whatever she got it was in there, and she**
22 **failed.**

23 Q: The details?

24 **A: If she fails to see a patient on Monday,**
25 **Tuesday, and Wednesday that will be spelled out.**

1  You fail to see assigned patient, we don't
2  necessarily always put their names in it. We
3  usually put that you failed to see three patients
4  on your assigned visit, that's just an example.

5  Q: That's what I'm having trouble with.
6  That's exactly what I mean. I have read your e-
7  mail, the e-mail that you put through Sammi, this
8  is sort of curious, this is not meant to be
9  fictitious here. But in that, you spelled her
10 name, S-A-M-M-I-E, when you did that e-mail,
11 right?

12 **A: Yes.**

13 Q: Isn't her name S-A-M-M-I? Or is it I?
14 Or I-E? I'm just curious, I've never seen that I-
15 E until I've read that e-mail. I don't have, to
16 pick my brain, I don't have it here.

17 **A: I'm not perfect either, so.**

18 Q: No, no, I'm just asking, I need to do my
19 job. That was not done to irritate her or
20 to...OK. Now, what I'm asking is as far as
21 contacting, I understand you don't put the
22 veterans' names in there, but do you, you know,
23 contact, you know Home B in such and such an
24 address, Home C, in such and such an address or
25 such and such case. I've never seen that kind of

1  that definitive thing, you see Cathy, you pulled
2  something up there, could you tell me what it is?

3  Frye: I'm pulling up a letter of extension
4  for September 11,2000.

5  Bailey: You need the exhibit number.

6  Hadrick: I need to go the restroom while
7  you're all looking through that.

8  Bailey: Let's, I tell you what, you go
9  ahead and go and we can talk about this stuff.
10 Beulah, Exhibit 4EE, I'm going to look at this
11 document, it's a part of the veterans' affairs,
12 it's got a reply number of 595-N121, imagine this
13 is the merit board, merit systems protection
14 board. I need to get a copy of those.

15 Frye: I don't have it as far as I can see.
16 This doesn't even go with this. I'll get a copy
17 of this.

18 Bailey: I don't know what the name of this
19 is, I don't even know what Sammi got it, she must
20 have gotten it from Bell. You have to
21 understand, I came by some of this stuff to, it
22 wasn't her fault because she was dealing with the
23 administrative thing. This is a...

24 Frye: A letter to Frederick Fishman it's
25 right there on the top. I'm just writing it down

1  so that I know what to ask for.

2  Bailey: It has a docket number, oh no I
3  can't say that. Let me just, oh Frederick L.
4  Fishman, administrative judge, it is, merit
5  systems protection board. OK, and it's got a
6  date of March 13th,2001, and I was looking at
7  4EE, and this is a letter subject: proposed
8  removal. It says, this is addressed to Ms. Sammi
9  Wright, and I notice here they spell it S-A-M-M-I-
10 E, so you may not be wrong. But, Extended Care
11 Product Line, VA Medical Center, Lebanon PA 170
12 Subject: Proposed Removal. This is to notify you
13 that the proposed removal for the position of
14 social worker, GS 185-11, and that's where they
15 quote, I want to look for this thing because I
16 figure they've enclosed your e-mail. And Sammi,
17 "I request you to schedule those homes that you
18 have not visited to be worked in your schedule
19 last week. I am not ordering you to schedule
20 next week and provide documentation on it.
21 Although you responded this message you did not
22 visit any homes you are hereby charged with
23 failure to comply with a direct lawful order".
24 Beulah, was Sammi Wright set up to be given a
25 task that she could not perform so she could be

BEULAH HADRICK

PAGE 193

1  Sammi responding.  "In responding to number 2 on
2  the suspension from duty for 14 days, this was
3  misappropriated time which was based on
4  allegations that were disproved with supporting
5  documents".  Do you know what she was referring
6  to for misappropriated time?
7      A:  No, and I can't remember what she's
8  referring to.
9      Q:  OK, and do you know what she may be
10  reporting to "respect to supporting documents"?
11  I realize we're just testing your recollection.
12      A:  Yes.
13      Q:  I mean, if you don't know, don't.
14      A:  No I don't know
15      Q:  She can respond to these later, and she
16  will but, if you remember.
17      A:  No I don't.
18      Q:  There were no records from you to
19  support your allegations on the alleged paged.
20  Do you know if there were any supporting
21  documents presented?
22      A:  No, I know that the people that tried to
23  contact her, reported her, and we had tried her,
24  and she didn't answer her page.  And I see in
25  there that she didn't know how to use the pager

PAGE 194

1  well, they weren't new pagers, so...
2      Q:  So you didn't believe it or there
3  were...
4      A:  I didn't believe it.
5      Q:  OK.
6      Video Operator:  It's 3:20 PM, August 1,
7  we're suspending.
8      Video Operator:  3:21 PM, we're back on the
9  record.
10      Q:  Would you agree that Sammi Wright was
11  transferred to extended care under your
12  supervision sometime on or about February 22nd,
13  2000?  Does that make sense or is she wrong on
14  that date?
15      A:  It may have been, I'm not the best with
16  these dates. We would have it documented
17  somewhere.
18      Q:  And she says here "there's been a
19  repeated unprofessional acts, discriminate,
20  undermine and harass with committing to create a
21  hostile environment working environment, with the
22  goal to have me removed or resigned for my
23  position of social worker.  Do you know of any
24  goal or any attempt to have her be removed or
25  resigned as a social worker?

PAGE 195

1      A:  No I don't.
2      Q:  And this last sentence, "this is after
3  over 20 years of professional work and no prior
4  disciplinary action".  Is Sammi Wright correct
5  about that?
6      A:  I don't know if she had, like I said, I
7  inherited her.  I don't usually go back to find
8  out if they had issues.  I didn't go back to her
9  previous.
10      Q:  Will you go back and check disciplinary
11  action if they're entitled to disciplinary leave
12  though, right?
13      A:  Yes.
14      Q:  You told us you did that.
15      A:  Yes, no, because I knew she had one at
16  the time, she was requesting it.  When she
17  requested it, I knew she had one, that's why I
18  disapproved it.  It's not.
19      Q:  No, the one she had, she acquired since
20  she came under your...
21      A:  Right, and I knew that one.
22      Q:  But, but what you're telling us now is
23  you don't know if she had any prior to coming
24  under your supervision.
25      A:  Whatever happens in that area, and I

PAGE 196

1  tell everybody.  Whatever happens in that area,
2  this is a new start.  I start everybody over, and
3  frequently we get people with disciplinary
4  problems that we take them on as new people.  And
5  I try not to let that influence my decisions.
6      Q:  OK.
7      Frye:  I have one question.
8      Bailey:  Sure.
9      Frye:  Are you done Don, I don't want to
10  interrupt?
11      Bailey:  Yes.
12      Frye:  The document that was referenced as
13  Exhibit 4EE, a few minutes ago, which was the
14  letter December 28,2000, subject: Proposed
15  Removal.  I just wanted to clarify, when you gave
16  Sammi Wright a direct order to schedule and visit
17  the veterans that she had not visited, did she
18  schedule and visit any of them?
19      A:  No.
20      Frye:  That's all.  Are you done?
21      Bailey:  Let's suspend, well I'm basically
22  done.
23      Video Operator:  Please be advised that the
24  camera is still running.
25      Bailey:  OK, we are finished, Beulah thank

BEULAH HADRICK

SHEET 50  PAGE 197

```
 1     you very much.
 2            Hadrick:  Oh, you're welcome.
 3            Bailey:  Cathy I think we need more time, on
 4     August 15, can you concur with somebody with
 5     reasonable mark?  I will discuss the details and
 6     get your approval on how much we need to,
 7     obviously we need, because I have to get these
 8     copies sent out.  Tony yes.
 9            Video Operator:  3:25 PM, August 1,2002,
10     we're concluding the deposition of Beulah
11     Hadrick.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMMI D. WRIGHT,
            PLAINTIFF            :
                                 :
                                 :
        VS                       :    NO.  1:CV-00-1657
                                 :
BEULAH HADRICK, CHARLEEN SZABO,  :
SCOTT SHREVE AND RAY KENT,       :
            DEFENDANTS           :

                VIDEO
                DEPOSITION OF:  RAYMER A. KENT

                TAKEN BY:       PLAINTIFF

                BEFORE:         KAREN L. BLOUCH, RMR
                                NOTARY PUBLIC

                                P.R. VIDEO, INC.
                                ANTHONY MARCECA,
                                VIDEOGRAPHER

                DATE:           JULY 9, 2002, 9:04 A.M.

                PLACE:          UNITED STATES ATTORNEY'S OFFICE
                                228 WALNUT STREET
                                HARRISBURG, PENNSYLVANIA


APPEARANCES:

        LAW OFFICES OF DON BAILEY
        BY:  DON BAILEY, ESQUIRE

            FOR - PLAINTIFF

        OFFICE OF THE UNITED STATES ATTORNEY
        BY:  MARY CATHERINE FRYE, ASSISTANT U.S. ATTORNEY

            FOR - DEFENDANTS

ALSO PRESENT:

        SAMMI D. WRIGHT

2

```
1                              INDEX

2                             WITNESS

3       WITNESS              DIRECT

4       Raymer A. Kent        10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

|    |                                                          |
|----|----------------------------------------------------------|
| 1  | STIPULATION                                              |
| 2  | It is hereby stipulated by and between                   |
| 3  | counsel for the respective parties that all objections   |
| 4  | except as to the form of the question are reserved to the|
| 5  | time of trial.                                           |
| 6  |                                                          |
| 7  | RAYMER A. KENT, called as a witness, being               |
| 8  | sworn, testified as follows:                             |
| 9  |                                                          |
| 10 | MS. FRYE:  Could we also please have a                   |
| 11 | record of who the principals are of P.R. Video,          |
| 12 | Incorporated, and what the actual address of the business|
| 13 | is?  The card just gives a post office box.              |
| 14 | MR. MARCECA:  Yes.  The address currently is             |
| 15 | in my residence, 2219 Dixie Drive, York, Pennsylvania.   |
| 16 | MS. FRYE:  And are you the owner of this                 |
| 17 | business?                                                |
| 18 | MR. MARCECA:  No.  I'm just contracted to                |
| 19 | them.  The principal owner is Adrienne, and I'm not sure of|
| 20 | the last name.  I have it somewhere in the files.        |
| 21 | MR. BAILEY:  Adrienne Palarino Bailey is the             |
| 22 | owner.                                                   |
| 23 | MS. FRYE:  Well, I'm going to have to go on              |
| 24 | the record then.   Don, I actually don't think that     |
| 25 | Mr. Marceca is authorized under the Federal Rules of Civil|

41

1        Q        Have you ever had occasion to ask the

2 veterans administration to conduct an audit of services,

3 you know, are our case workers getting out there, do we

4 have good -- do we have a verification criteria that's a

5 good management practice, that type of thing?

6        A        I wouldn't.  But we do have a quality

7 management department, and the extended care services and

8 mental health services would have had that responsibility.

9        Q        Do you or Beulah report to them that there

10 were questions about Sammi Wright doing her job, showing up

11 and doing her job?

12        A        Report to whom?

13        Q        To the people that have this quality care

14 management responsibility within the organization, who

15 perform the, apparently the investigatory or audit

16 functions, compliance functions.

17        A        That's primarily the supervisor's function.

18        Q        In this case, that would have been Beulah's

19 function?

20        A        Exactly.

21        Q        The methodology that you had suggested was

22 to call the custodians, either the people that cared for

23 these veterans or the veterans themselves, to verify if

24 visits occurred, correct?

25        A        And to speak to Mrs. Wright.

42

1      Q        And to speak to Mrs. Wright.  Well, you had
2  indicated that Mrs. Wright, you didn't know where
3  Mrs. Wright was.  Correct?
4      A        Not at that specific time, no.
5      Q        You say not at that specific time, no.  Are
6  you saying that at that specific time we didn't know where
7  she was?
8      A        At the day in question.  But by the next day
9  she had reported in, was on the property at the Medical
10  Center.
11      Q        So the problem you described is one where
12  she didn't report where she was, that means she didn't call
13  in, is that what that -- that's a call-in function?
14      A        Didn't call her supervisor, didn't contact
15  the telephone operators.
16      Q        Were all of the case workers that worked
17  like Sammi subjected to that same requirement?
18      A        To my knowledge there were only two, and
19  both of them were, yes.
20      Q        Who is the other one?
21      A        Gregory Ratkoff.
22      Q        Gregory Ratkoff.  Just in case,
23  R-A-T-K-O-F-F?
24      A        I'm pretty sure.
25      Q        Where is Gregory now?

43

1       A         He also works in mental health on the acute
2   in-patient psychiatric ward.
3       Q         How did this contact function take place?
4   In other words, when they arrived at a particular location,
5   call in saying I'm here, you know, like a police officer
6   does?
7       A         No, it wasn't that tight.  It was generally
8   let your supervisor and the telephone operator know where
9   you're going to be for the day.
10      Q         I may be in error with the assumption that
11  underlies this question.  If I understood correctly, I got
12  the impression that you and Beulah described this, you told
13  Beulah how to verify.  Neither you nor Beulah contacted
14  Sammi Wright, but on the particular occasion we're talking
15  about, the next day, Sammi either reported in or accounted
16  for herself, am I correct?  Did I miss something there?
17      A         I don't think you are correct.
18      Q         Okay, correct me.  Please tell me how I was
19  in error.
20      A         The next day in the normal course of
21  assignments she had time that she would be at the hospital
22  to do her notes, etcetera, so she was present at the
23  hospital.
24                I know Mrs. Hadrick and I think Mrs. Scott
25  both tried to contact Sammi Wright to ask where she was

1    during that period of time, to clarify that, and why she

2    hadn't notified either her supervisor or team leader or the

3    telephone people as to where she was going to be that day.

4        Q        And your recollection is that, at least in

5    Beulah's case, Gregory and Sammi Wright were subjected to

6    the same requirements.

7        A        Yes.

8        Q        What about other case workers for other

9    supervisors, were they subjected to the same requirements?

10       A        I don't know.

11       Q        The reason I ask that is I asked you about

12   the methodology, and I asked you about the quality control

13   function.  You had responded that that was a supervisor

14   responsibility more or less.

15                My next question is, did each supervisor

16   then set up their own criteria for how a case worker was to

17   report or account for their time and whereabouts?

18       A        There were not a whole variety or huge

19   number of case workers going out on the road doing similar

20   work to Mrs. Wright and Mr. Ratkoff.

21                We had some homeless -- we have a homeless

22   program where case workers go out on the road to different

23   assignments.  And they either have a cellular phone that

24   they report in with, or call in as they plan out their

25   assignments in advance.

36

1    response that you would then check it out or investigate

2    it, if it seemed to have some merit to it.  Is that fair to

3    say?

4         A         Check it out.  In many cases I had been

5    contacted by the supervisor previous to that visit.

6         Q         Can you tell me who the supervisors were, if

7    there are more than one?

8         A         The only ones I remember were Jeanne Lantzy,

9    Beulah Hadrick, and a team leader by the name of Lola Belle

10   Scott.

11        Q         Do you have any recollection of checking out

12   one of Sammi Wright's objections or questions or ventings

13   with Jeanne Lantzy, any one in particular that you can

14   remember?

15        A         Not a particular incident.  This would have

16   happened more than five years ago.

17        Q         Do you have any recollection as you sit here

18   today of any specific instance where Beulah Hadrick had

19   called you and you had discussed, or you had discussed with

20   her, you had called her, a particular issue that Sammi

21   Wright asked questions or vented about in your office?

22        A         Yes, more than one.

23        Q         Would you please begin and tell us about

24   them ad seriatim, please.

25        A         I remember instances where questions were

1    raised by Mrs. Hadrick over proper use of government

2    vehicles.  Questions were raised about communications

3    links, like reporting to telephone operators or to her

4    supervisors as to her whereabouts on days.

5                I remember questions concerning plan

6    schedules and requiring plan schedules for visits.  I

7    remember questions concerning verifying or means of

8    verifying that their visits were actually held.

9        Q        Let's go through those, okay?  Who would --

10   was it Sammi Wright who was complaining about the means of

11   verifying whether visits were held?  Or was it Beulah

12   saying that there was a problem with that?  Can you be a

13   little more specific?

14       A        Yes.  Beulah came and asked whether there

15   was a way to verify whether or not a visit was actually --

16   actually took place.

17       Q        That begs the question, and the question is,

18   was Beulah implying, or was she stating to you that Sammi

19   was not, in fact, conducting visits?  And I guess there's

20   going to be another question after that, whether she was

21   falsifying information or presenting incorrect information?

22               MR. BAILEY:  Before counsel --

23               MS. FRYE:  I'm going to object.

24               MR. BAILEY:  Before counsel objects, let me

25   withdraw.

38

BY MR. BAILEY:

1

2      Q       Let me go back and ask you to please give a
3  recollection of Beulah's discussion with you about the
4  issue of verifying whether a visit took place.

5      A       The question was in relationship to
6  reporting her whereabouts.  My recollection is that
7  Mrs. Hadrick had given both the social workers instructions
8  that they should inform her in advance as to where they
9  would be during the days and also inform the telephone
10 operator so that if they were needed, there would be a way
11 to contact them.  Because we were having -- I know we had
12 problems with the pager systems during that same time
13 frame.

14         And the question arose because Mrs. Hadrick
15 had no, at that point had no knowledge of where Sammi
16 Wright was during that period that day.  And attempts had
17 been made to contact her, and the attempts had failed.

18     Q       That's what she told you?
19     A       Yes.
20     Q       Did you investigate that?
21     A       I told her how to investigate that.
22     Q       I'm assuming this would have taken place
23 before Sammi Wright came into your office and vented or
24 asked questions about it, if indeed she ever did.
25     A       Yes.

39

1      Q        Let's continue with the -- let's call it the

2   verification question here as to visits.  The verification

3   as to visits.  What did you tell Beulah she should do, how

4   she should seek to verify a visit?

5      A        Well, two different ways.

6      Q        Okay.

7      A        To discuss it with Mrs. Wright.

8      Q        Okay.

9      A        And to also contact the homes to see if

10   Mrs. Wright was seen in the area.

11      Q        You're a human relations assistant and

12   director by this time, or at least in that line of work for

13   almost 20 years, is that right?

14      A        Yes.

15      Q        Did Beulah indicate to you why she felt

16   there was a need to verify Sammi Wright, Sammi Wright's

17   visits?

18      A        Because she had not reported in, and they

19   were not able to contact her.

20      Q        Do you know if Beulah questioned Sammi

21   Wright about her visits before she called the clients, as

22   it were, the homes or wherever the visits were taking

23   place, to verify whether or not Sammi Wright had been

24   there?

25      A        I don't know that.

40

1       Q       Well, I ask that question because in your
2   experience, by checking up on or investigating an employee,
3   do you affect that employee's reputation or relationship,
4   based on your experience, in those situations, with clients
5   or with the folks that look after the clients out there?
6       A       I don't know.
7       Q       Has that ever been a matter of concern to
8   you, Ray?  Or is that not a real problem?
9       A       I don't know that it's been a significant
10  problem I would worry about.
11      Q       I'm not trying to be -- to talk down to you,
12  but you know what an audit is, right?
13      A       Certainly.
14      Q       You used the term earlier here today
15  compliance, do you remember that?
16      A       Yes.
17      Q       Do you know what a compliance audit is?
18      A       Absolutely.
19      Q       Did you ever ask to have Sammi Wright call
20  the veterans administration and ask to have her case load
21  audited?
22      A       No.
23      Q       I'm not implying that you should have.  I'm
24  just asking you if you did.
25      A       No.

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

1          But for the program that Sammi Wright was
2    involved in, there were only two social workers going out
3    on the road at the time.

4          Q          Briefly describe that program, that will
5    help, give us an idea of what she was doing.

6          A          They're responsible to check on the patients
7    and make sure the patients in these contract homes are
8    getting appropriate care; and that their condition is
9    stable and within the required norms.

10          Q          An on site physical visit face-to-face?

11          A          On site physical visit --

12          Q          Hands-on --

13          A          Hands on, eyes on, talk, if the patient is
14    coherent.

15          Q          They do a report, they do a written report
16    when they get back on that?

17          A          Exactly.

18          Q          Do they have, in a given week, they have any
19    requirements that they report, you know, on a daily basis,
20    every other day, once a week at the hospital?

21          A          They have reporting guidelines, yes, but I'm
22    not -- I can't quote them verbatim.

23          Q          I wouldn't expect you to do that, Ray.  But
24    did you ask Beulah how often Sammi was supposed to be back
25    in the hospital?  To do reports, obviously if they need to

46

1    do reports.

2        A        They had a plan, generalized plan scheduled.

3        Q        Do you know what precipitated the need to,

4    if there were a plan schedule and reports were being made,

5    I'm going to assume that from the report product, one could

6    tell that at least the worker is claiming they were there

7    doing these things.

8                 The issue that you and Beulah were

9    discussing was verification, whether these visits actually

10   took place, is that fair to say?

11       A        On one specific day where the employee

12   couldn't have been contacted.

13       Q        So on one specific day when there was an

14   apparent attempt to contact Sammi Wright, which could not

15   be consummated, they couldn't contact her, Beulah came to

16   you and raised the verification question, am I correct?

17       A        Yes.

18       Q        Did Beulah indicate that there was a history

19   of misconduct along these lines, if indeed this was

20   misconduct or error or noncompliance, by Sammi Wright of

21   this type when she came to you on that day?

22       A        She indicated there was a history of

23   noncompliance with notifying supervisors and the telephone

24   operators as to her planned whereabouts and methods of

25   being contacted.

47

```
1        Q        Did Beulah indicate how long this had been
2   going on?
3        A        Yes, but I can't remember the period.
4        Q        Now, Sammi came in the next day.  And again,
5   I hope you will to forgive me, because I may have not
6   understood you.  I gained the impression from your
7   testimony that Sammi came in the next day, by coming in the
8   next day, that this resolved some of this problem.
9        A        I don't think Sammi came in the next day,
10  and it did not resolve the problem.
11       Q        I did get the wrong impression, because I
12  didn't understand how it could since the issue was
13  verification.
14                Indeed did Beulah go out, follow your
15  instructions or suggestions, as it were, and conduct a
16  verification investigation, verification of visit
17  investigation?
18       A        Yes.
19       Q        And the results were?
20       A        She contacted two homes.  And both homes, I
21  think it was, like, the director of the home, said they had
22  no recollection of a visit.
23       Q        If Sammi didn't say where she was supposed
24  to be, can you tell us why Beulah contacted those homes?
25  Or are there only two homes?
```

48

1       A        She asked where she was supposed to be those

2    days.

3       Q        So your testimony is that Beulah asked

4    Sammi --

5       A        Not necessarily Beulah.  It may have been

6    Lola Belle Scott.  Someone asked, where were you that day.

7       Q        Someone asked her, her being Sammi Wright,

8    where she was on a particular day --

9       A        Stating that they could not contact her,

10   they tried and failed.

11      Q        And Sammi Wright indicated that she was

12   someplace, and when they called to verify the visit, the

13   information indicated Sammi Wright had not been there?

14      A        Yes.

15      Q        What did you do next?

16      A        We discussed the overall situation about

17   Sammi Wright's failure to comply with instructions that had

18   been given to her verbally and in writing and actions that

19   would precipitate from that to correct it.

20      Q        Who did you have that meeting or discussion

21   with?

22      A        Beulah Hadrick.

23      Q        Beulah Hadrick?

24      A        Beulah Hadrick.

25      Q        Hadrick.  H-A-D-R-I-C-K.  Okay.  Was anyone

49

1    else present at that time?

2         A         There were a series of telephone calls about

3    it as well with Lola Belle Scott, with Beulah Hadrick, with

4    another person specialist assigned to the office.

5         Q         On your question you had indicated that this

6    information, this verification information, could have been

7    developed by, you weren't sure, Lola Belle, right?

8         A         Yeah, Lola Belle Scott or Beulah Hadrick.

9         Q         Miss Scott or Miss Hadrick.  Now, did Miss

10   Scott come to you also complaining about Sammi Wright?

11        A         She came to me asking questions.

12        Q         Did you find that Sammi Wright was

13   falsifying reports?

14        A         I didn't find anything.  I didn't do the

15   investigation.

16        Q         Let me ask, take a little diversion here and

17   ask a few questions about your organizational structure.

18   Are you equivalent to personnel director?

19        A         Your definition of personnel director would

20   be what?

21        Q         I'm looking at Beulah's chain of command.

22        A         I don't supervise anyone outside the human

23   resources office.

24        Q         Why did Beulah come to you?

25        A         Because I am the on site advice and guidance

115

```
1    STATE OF PENNSYLVANIA    :
                              :  ss
2    COUNTY OF LEBANON        :

3              I, Karen Blouch, a Reporter Notary-Public,

4    authorized to administer oaths within and for the

5    Commonwealth of Pennsylvania and take depositions in the

6    trial of causes, do hereby certify that the foregoing is

7    the testimony of Raymer A. Kent.

8              I further certify that before the taking of

9    said deposition, the witness was duly sworn; that the

10   questions and answers were taken down stenographically by

11   the said reporter Karen Blouch, a Reporter Notary-Public,

12   approved and agreed to, and afterwards reduced to

13   typewriting under the direction of the said Reporter.

14             I further certify that the proceedings and

15   evidence contained fully and accurately in the notes by me

16   on the within deposition, and that this copy is a correct

17   transcript of the same.

18             In testimony whereof, I have hereunto

19   subscribed my hand this 15th day of July, 2002.

20

21

22                     Karen L. Blouch, RMR,

23   My commission expires:
     October 14, 2005

24

25
```

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMMI D. WRIGHT,                          :
            PLAINTIFF                      :
                                          :
        VS                                :    NO.  1:CV-00-1657
                                          :
BEULAH HADRICK, CHARLEEN SZABO,           :
SCOTT SHREVE AND RAY KENT,                :
            DEFENDANTS                     :


            VIDEO
            DEPOSITION OF:  SCOTT T. SHREVE

            TAKEN BY:       PLAINTIFF

            BEFORE:         SHERRY BRYANT, RMR, CRR
                            NOTARY PUBLIC

            DATE:           SEPTEMBER 12, 2002, 1:05 P.M.

            PLACE:          LAW OFFICES OF DON BAILEY
                            4311 NORTH SIXTH STREET
                            HARRISBURG, PENNSYLVANIA


APPEARANCES:

    LAW OFFICES OF DON BAILEY
    BY: DON BAILEY, ESQUIRE

        FOR - PLAINTIFF

    U.S. ATTORNEY'S OFFICE
    BY: MARY CATHERINE FRYE, ASSISTANT U.S. ATTORNEY

        FOR - DEFENDANTS

ALSO PRESENT:

    ALBERT RODRIGUEZ, VIDEO OPERATOR
    SAMMI D. WRIGHT

2

```
 1                          INDEX

 2                         WITNESS

 3

 4  FOR PLAINTIFF          DIRECT    CROSS

 5  Scott T. Shreve           3        80

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

STIPULATION

1
2          It is hereby stipulated by and between counsel
3   for the respective parties that reading, signing, sealing,
4   certification and filing are waived; and that all objections
5   except as to the form of the question are reserved to the
6   time of trial.

7
8          SCOTT T. SHREVE, called as a witness, being
9   sworn, testified as follows:

10
11                    DIRECT EXAMINATION

12
13  BY MR. BAILEY:
14      Q          Sir, Don Bailey here.  I'll be moving forward
15  through the deposition here.  You have a court stenographer
16  here taking the copy of the deposition as an alternative
17  means as the rules provide.  So it's doubly important that we
18  allow our questions and answers to be separated so that she
19  can get a good clear testimony.  Okay?
20      A          (Nods head affirmatively.)
21      Q          Now, I don't expect you will interrupt me, but
22  I sometimes make that error, and if I do, if your attorney
23  doesn't catch me, although she usually does, you make sure
24  that you get a complete and full answer, in fairness to you.
25  Okay?

1    A        (Nods head affirmatively.)

2    Q        If at some time you want to ask me what I mean

3 by a question or where I'm going with a series of questions,

4 I don't mind that at all and that goes for your attorney.

5 I'm really just after a complete fact record.  I'm not a

6 believer in trick questions and I try my best never to

7 confront or argue with a witness.  If you feel my manners are

8 getting bad, you tell me, okay?

9    A        Okay.

10    Q        And aside from that, keeping your voice up and

11 so that we get a good audio copy on these things.  I won't

12 be -- I don't have too much for you, okay, and I have a

13 tendency not to overdo these things.  And then Cathy Frye,

14 Attorney Frye may have some questions for you after I'm done,

15 and it won't take too much of your time.  Okay?

16    A        That will be fine.

17    Q        Do you have any questions of me, sir, before?

18    A        No.

19    Q        I understand it's Dr. Shreve; is that correct?

20    A        It is, correct.

21    Q        And can you give us, are you an M.D., is it

22 psychology, psychiatry, social workers, I don't know what

23 your --

24    A        I'm a doctor of osteopathy, fully licensed in

25 the state of Pennsylvania.

5

1    Q        And, sir, my understanding is that you work

2   for the Veterans Administration.

3    A        Correct.

4    Q        Can you share with us, please, in what

5   capacity?

6    A        I'm the associate chief of staff for extended

7   care.  We have approximately 200 employees in that product

8   line.  I also have an academic appointment at the

9   Pennsylvania State University.  I'm an associate professor of

10  clinical medicine.

11   Q        Where does the term "product line" come from?

12  I don't want you -- you know, it always strikes me as sort of

13  a commercial kind of a business thing, and I'm an

14  old-fashioned people person type or at least I like to call

15  myself that.  What does product line mean?

16   A        It means that many of the disciplines fall

17  under one authority.  As opposed to having just a nursing

18  service with a nurse manager, there is a product line and all

19  the employees within that product line that deliver that

20  product or service are under the same authority.

21   Q        Great.  Thank you.  That helps a great deal.

22  At some point did Ms. Wright, Sammi Wright come within your

23  jurisdiction, chain of command, or whatever you call it

24  there?

25   A        Yes.  She was within the extended care product

1  line.  She did not directly report to me.  She had a group

2  leader, which she was responsible for day-to-day assignments.

3  That would be Lola Bell Scott.  She then had a supervisor,

4  and that was Beulah Hadrick.  And Beulah Hadrick reported to

5  me, as the associate chief of staff.

6      Q        Okay, Doctor, what I'd like to do now, I'm

7  going to ask you some questions about how that management

8  structure and your management style work, okay.  You've

9  outlined the chain of command where Sammi Wright reported to

10  Ms. Bell, who reported to Ms. Hadrick, who reported to you?

11      A        Correct.

12      Q        Did you have any structured process where you

13  reviewed with supervisors on let's say a calendar basis their

14  interactions with personnel or matters of personnel

15  management?  Do you understand the question?

16      A        I believe so.  On an annual proficiency

17  review, I would be the secondary signer for proficiencies

18  that, say, Beulah Hadrick had performed on her subordinates.

19      Q        Sammi Wright has testified that sometime in

20  late 2000, I believe, she received a bad performance

21  evaluation.

22      A        Yes.

23      Q        What can you tell us about that, from your

24  memory?

25      A        Oh, my gosh.  It was frustrating.  To give you

7

1    an example, there were so many examples of her belligerence

2    in her duties, our inability to even locate her, where she

3    was on the job, her refusal to respond to direct orders from

4    her supervisor for things as simple as checking in in the

5    morning, letting us know where your daily routine -- where

6    your daily assignments are going to be.

7        Q        Doctor, how often did she, if you can, if it's

8    possible for you to quantify, how often she did those kinds

9    of things?  Let's put a time parameter on it.  Let's look

10   at -- so we can -- to put some time restraints on this thing,

11   she came under your jurisdiction or authority let us speak

12   here, so to speak, I guess, maybe in early 2000, February?

13       A        January.  January is my understanding.

14       Q        Okay, sir.  And is she under your control now?

15       A        Sammi Wright?

16       Q        Yes.

17       A        No, no.

18       Q        Well, let's do this.  Let's just look at the

19   year 2000.  That will help us.  Then we get into some things

20   maybe after that.  Now, you've indicated all of these things

21   that she did wrong.  I mean these are wrong and erroneous

22   things that she did; right?

23       A        Yes, I believe.

24       Q        Belligerent and uncooperative and

25   disregarded -- excuse me, disobeyed direct instructions and

8

1  that kind of thing.  What direct instruction did you ever

2  give her that you gave her, if, indeed, there were any, that

3  she disobeyed?

4      A       None.

5      Q       How much interaction did you have with her,

6  sir?

7      A       I would meet with the social workers in our

8  product line on a monthly basis, and at those meetings

9  Ms. Wright would turn, face the other direction.  She would

10 often refuse to participate, set just a very hostile tone

11 with the meeting.

12     Q       Did you counsel her on that?

13     A       I did not.  There were so many other issues

14 going on at the time that I thought it would only worsen the

15 situation.  So I did not confront her personally with that,

16 no.

17     Q       Did you make any notes or keep any summaries

18 of how she acted at these meetings?

19     A       No.  We take minutes at those meetings for the

20 official business, but her conduct at the meeting was not a

21 part of those official minutes.

22     Q       Did you ever talk with Beulah, with

23 Ms. Hadrick about Ms. Wright's behavior?

24     A       Oh, many times.

25     Q       Many times?

9

1    A        Many times about her behavior overall.

2    Q        Can you give me some more substance about what

3    occurred during those discussions.

4    A        Oh, boy.  The most important one that sticks

5    out in my mind was -- that led to her suspension initially

6    was her refusal to check in in the morning and inform us of

7    her daily kind of where she was going to her work for that

8    day.

9    Q        Could we stop.  Can we stop right there for

10   one question.  Why did you want her to check in in the

11   morning and give you her daily schedule?

12   A        It wasn't just her.  It was all the

13   residential care social workers.

14   Q        That's what I was going to ask.  Okay.

15   A        We sent out a memo informing all of the

16   residential care social workers in the program that we needed

17   to know where they were.  We were going to be monitoring

18   their work load and we needed them to -- you could do this in

19   less than 30 seconds in an e-mail as to I'm here, here are

20   the visits I'm planning for today, and go about your

21   business.  And after many written notices, verbal notices,

22   Ms. Wright just refused to cooperate with that.

23   Q        In the audit business, they call it post

24   expenditure audit.  Did you ever have any reporting procedure

25   on activities after the fact, end of day, end of week, end of

1   month?

2        A        We did.  Generally, at the end of the month we

3   tried to track the number of visits that were occurring, yes.

4        Q        And your recollection is that Sammi Wright was

5   required to do these things no differently than anyone else?

6        A        Correct.  It would be uniformly applied to all

7   the residential care social workers and continues to this

8   day.

9        Q        Now, she's made some allegations, that

10  obviously she's made general allegations and some specific

11  complaints about her being treated differently than others.

12  So at this juncture, and I'd like to go back, let you finish

13  the litany that you had started when I interrupted you, okay.

14  I interrupted you about the reporting requirement in the

15  morning.

16             And I think the question on the table at that

17  time, and I'll repeat it to clarify things, was, what are the

18  other things that she did to disobey?  One of my questions

19  had been did she ever disobey you personally.  I think you'd

20  indicated that that did not occur, but that she did not

21  follow other instructions that you played a role in

22  promulgating as a supervisor.

23        A        Yes.

24        Q        Okay.  Can you give me more examples then of

25  the things that she -- the instructions she failed to follow

1    or, you know, indicate indicia of her belligerency, that type

2    of thing, can you give me more examples?

3        A        Yes.  She was ordered both verbally and in

4    writing to notify her group leader and/or her supervisor of

5    her schedule by sending one message a day, and also we had

6    other people copied on this message to inform them of her

7    whereabouts, and repeatedly ignored this order on June 13th,

8    June 15th, June 16th, June 19th, June 20th, July 7th and July

9    10th of 2000.

10                Also, she repeatedly refused to answer pages

11    in a timely manner.  On June 12th, she was paged four times

12    between 7:55 a.m. and 11:15 a.m. and she neither responded to

13    it nor did she report a problem with her pager.

14        Q        Why not just fire her for doing that?  I mean

15    that's pretty bad stuff, isn't it?

16        A        At the time proposed suspension was the

17    disciplinary action.

18        Q        Who thought that up?  I don't mean that in a

19    negative -- don't take that in a pejorative sense.  I don't

20    mean it in a negative way.  Who first suggested that perhaps

21    she be terminated?

22        A        I don't recall who would be first, but this --

23    if you want me to explain the process of how we would go

24    about determining that, I can do that, but I don't remember

25    who would have first said that.  The government structure has

12

1    a step-wise fashion for disciplinary action, so it goes up

2    step-wise and this was worked out in conjunction with human

3    resources.  But I don't remember any one person putting that

4    forth.

5        Q        You mean progressive discipline; right?

6        A        Progressive discipline, yes.

7        Q        Which is I think pretty common in the United

8    States in private and government sectors.  What do you mean

9    by -- you used the phrase "worked out with human resources."

10       A        Yes.

11       Q        Can you provide more of a substantive

12   response?

13       A        They're the specialists in knowing the

14   regulations and appropriateness of disciplinary action.  So

15   they're involved before any final letter would go out to the

16   employee.

17       Q        At some point was there a suggestion that

18   Sammi Wright be brought in and advised that she was in

19   trouble if she kept doing these things?  I'm not saying that

20   didn't happen.  I just wonder if you have any knowledge of

21   it.

22       A        There are multiple -- there were multiple

23   verbal counselings with Sammi Wright.  There were numerous

24   memos to Sammi Wright.  There were letters of disciplinary

25   action, progressive disciplinary action notifying her of the

13

1    deficiencies in her performance and conduct.

2         Q         Well, she, as you probably know or may not

3    know, contests at least some of those and alleges that she

4    was able to produce statements, for example, from residential

5    homes and from veterans I believe in some cases themselves.

6    I'm not sure now, but I know from folks that were part of the

7    service group that she was providing services for, that, in

8    fact, those things were not correct.

9              Did you ever have any doubts that there was

10   perhaps a question that she was not doing the things wrong

11   that she was accused of doing wrong?

12        A         No, I had no doubt about that.

13        Q         Well, let's talk about that for just a moment

14   and I'll tell you why I ask that question.  I ask that

15   question because I believe you'd indicated that you didn't

16   have that much personal interaction --

17        A         Correct.

18        Q         -- except for these monthly meetings with

19   Sammi Wright.

20        A         Correct.

21        Q         Well, where did you get your information that

22   leads you to feel so strongly that Sammi Wright was, in fact,

23   responsible for misbehaving in this fashion?

24        A         Multiple verbal/written counselings and no

25   reported change in her behavior from her group leader and/or

14

1   her supervisor.

2       Q        So the information input that you received --

3   and I'm going to go back and I'm going to ask you just in a

4   few minutes, again, to let you know where I'm coming from,

5   about your interactions with Sammi Wright.  So your input,

6   your source of information then was Beulah Hadrick --

7       A        Yes.

8       Q        -- and/or Ms. Bell; is that correct?

9       A        Right.  Scott.

10      Q        I'm sorry.

11      A        Lola Bell Scott.  Scott is her last name.

12  Yes.

13      Q        I called her Bell here.  That's a family name,

14  believe it or not, Bell.  But, anyway, Ms. Scott answered

15  to -- and I think I'd used Bell earlier and I hope the record

16  should be corrected, it's Lola Bell Scott then and I made a

17  mistake.

18               Okay, now, did you interact much with Lola

19  Bell Scott in the sense of -- what I mean is talk with her

20  that much about Sammi Wright?

21      A        Occasionally.  Not as frequently as Beulah,

22  Beulah Hadrick.

23      Q        How often did you talk with Beulah about Sammi

24  Wright?

25      A        I interacted with Beulah multiple times every

15

1    day.  So if there was an active issue with Sammi Wright, I

2    suspect I heard about it within a day if I was on station.

3        Q        Did she ever indicate to you that Sammi Wright

4    was really good at some things?

5        A        No.  We saw no positives at this point in the

6    relationship.

7        Q        No redeeming virtues?

8        A        No redeeming qualities, no.

9        Q        No redeeming qualities at all.  That is

10   tragic.  Okay.  All right.  Now, did Sammi Wright ever come

11   and talk to you?

12       A        I don't recall any meeting that Sammi Wright

13   initiated.

14       Q        Do you know if -- she has testified that she

15   tried, she attempted to talk to you and says that, her

16   allegation is that, her allegation of fact is that she was

17   told to give a list to your secretary.  Do you know anything

18   about that?

19       A        I do not.

20       Q        Do you deny that?

21       A        I'm not aware of anything of that.  I

22   generally operate on an open door policy as far as my office,

23   but if an employee wants to come to me, they have to have

24   first brought the complaint to their direct supervisor and

25   then I want to talk with the supervisor about it before they

16

1   would come to speak with me, but I don't recall her ever

2   requesting a meeting and I don't recall ever asking anyone to

3   leave a list.

4        Q      Is an employee precluded from coming to you at

5   all unless they get clearance from their immediate

6   supervisor?  And the reason I'm asking that is those

7   situations which occur now and then where the employee has a

8   problem with the immediate supervisor.

9        A      Yes.

10       Q     And what comes to mind particularly are cases

11   of sexual harassment and that sort of thing.  So the next

12   thing I want to ask you is what the policy was, not your

13   policy, but VA policy.  Let me begin at the beginning.

14         Can one of the people that you supervise, do

15   they have any permission or any right to come to you without

16   first going to the immediate supervisor?

17        A      Yes.

18       Q     And at the time that you were supervising --

19   one step away, I understand that -- Sammi Wright, that policy

20   was in effect?

21        A      There was no policy, but I'll call it a

22   practice, yes.

23        Q     That's fine.  That's okay.  That that practice

24   was in effect and was it known to the employees?

25        A      As best as I can.  I have many people at lower

1    levels coming into my office on a daily basis.

2        Q        And you're saying Sammi Wright never came in

3    to you?

4        A        Not that I recall, no.

5        Q        Did Sammi Wright ever go to Mr. Kent?

6        A        I believe she did go to human resources, but I

7    don't know of that interaction, and the only way to answer

8    that more completely is I know that she refused union

9    representation at multiple times that it was offered to her.

10       Q        How many times were you present when she

11   refused union representation?

12       A        When I was present?

13       Q        Yes, when you were there.

14       A        I don't recall.  I don't recall how many times

15   that would be for myself.

16       Q        Were there any?

17       A        I don't recall.

18       Q        What's beginning to emerge for me, and I want

19   you to correct me if I'm in error, is that your primary

20   source of information about Sammi Wright was Beulah Hadrick?

21       A        Yes.

22       Q        And a secondary source of information would

23   have been Lola Bell Scott?

24       A        Correct.

25       Q        Can you add anybody to those two that provided

1    input as to the personnel actions, behavior and conduct of

2    Sammi D. Wright?

3         A         Yes.  This is a written -- in the VA it's

4    called a report of contact and it's a written statement of an

5    interaction, typically a difficult interaction.  This is by

6    Jackie Brown, who is also a nurse who works in a similar

7    geographic area to where Lola Bell Scott and Sammi Wright

8    would have been.

9              And it says here, at approximately 1 p.m.

10   received a phone call stating that a social worker at our

11   facility had attempted to contact Sammi Wright but was

12   unsuccessful and they've had difficulty in contacting her.

13   And Ms. Brown I believe went on to try to contact her again

14   also and didn't do it until the following day after multiple

15   pages.

16        Q         Doctor, that was part of the pager problem;

17   right?

18        A         I don't know if it was part of -- we have no

19   documentation of any pager problem.  We have problems with

20   response to the pages.

21        Q         I mean, I'm sorry, the allegations of failure

22   to respond to the pager?

23        A         Correct.

24        Q         I mean that's what that's part of; right?

25        A         It certainly would seem it to me, yes.

1    Q        Well, who put that together?

2    A        This is written by Jackie Brown and she sent

3    this.

4    Q        I know that, but isn't it part of -- wasn't

5    there some effort to gather information about Sammi Wright

6    and how she did things?

7    A        Just whenever people have a problem tracking

8    down an employee that should be immediately available, they

9    should report it.

10   Q        Well, do you know whether that response was --

11   well, did you talk to, is it Nurse Brown?

12   A        Yes.

13   Q        Did you talk to Nurse Brown?

14   A        I likely did, although I can't recall the

15   exact conversation.

16   Q        Do you know whether her responses were

17   solicited or were they --

18   A        I do not know that.

19   Q        Do you know whether she just felt duty-bound

20   to report that?

21   A        I don't know.

22   Q        Do you know whether responses from other staff

23   about Sammi D. Wright were solicited by anyone such as, for

24   example, Beulah Hadrick?

25   A        I'm not aware of it.

1    Q        Did you solicit any responses, comments, fact

2  summaries or anything of that sort from any employees or

3  staff about Sammi D. Wright?

4    A        I did not.  I don't recall any and I don't

5  believe I did.

6    Q        Some of the things that you have responded

7  with have indicated it to me, and I'm asking about certain

8  conduct on behalf of the supervisors that leads me to this

9  question.  Was there an effort to gather information about

10 Sammi Wright to put together a progressive discipline process

11 on her?

12   A        I believe there was such an abundance of

13 evidence that the data was readily available.

14   Q        And, therefore, when was the decision made

15 that the data was going to be put together to terminate her?

16   A        Well, I think that was part of the progressive

17 discipline.  So it led up to that and --

18   Q        Well, no, sir.  Let me --

19   A        I'm sorry.

20   Q        That was a poorly structured question and I

21 apologize for it.  At what point, if, indeed, it ever

22 occurred, was the conclusion reached in the year 2000 that,

23 you know, we're going to dismiss this lady, she's, you know,

24 she's out there just being a real problem for us?

25   A        I would believe that to be the notice of

1   removal, the letter of removal, and that would be the first

2   time that I had heard of termination being mentioned.

3        Q        Now, are you talking about proposed suspension

4   or are you talking about the notice of termination, which

5   actually occurs late 2000 or early --

6        A        December 20th, 2000 was the letter of proposed

7   removal.

8        Q        Right.  And that's the first time the idea of

9   removing her ever came up?

10       A        Yes, as far as I'm aware, the first time it

11  was ever formally brought forward in conjunction with human

12  resources and her supervisor.

13       Q        Doctor, I don't mean that.  I don't mean

14  formally brought forward.  I've got a situation here where

15  we've got this employee who's being insubordinate,

16  disrespectful, belligerent and discourteous; is that fair to

17  say?

18       A        Pretty darn accurate.

19       Q        Am I being kind?

20       A        No, you're pretty much on target.

21       Q        Pretty much on target.  And that kind of

22  misconduct is, as far as your information sources were

23  concerned, that kind of misconduct is occurring as early as

24  March and April of the year 2000?

25       A        Yes.

1    Q        And you're not actually testifying that nobody

2    thought about getting rid of her until December of 2000, are

3    you?

4    A        Yes, because in the federal system we had

5    progressive discipline, and just because someone is

6    belligerent, it doesn't mean that they're fired the next day.

7    So no, I mean I don't believe that it worked up to that until

8    the end of the year.

9    Q        Now, there was so much misconduct on her part

10   that I'm having a hard time understanding why you waited

11   until December 2000 to get rid of her.

12   A        It wasn't a question of waiting.  We were

13   applying appropriate disciplinary procedures all the way up

14   to that time.

15   Q        Is she working for the VA now?

16   A        Yes, she is.

17   Q        What went wrong?

18   A        What went wrong with what?

19   Q        Well, I'm not engaging in tautologies, but we

20   have somebody who misbehaved a great deal, in simple terms,

21   pervasive misconduct, and she's still working for the VA.

22   Why?

23   A        I don't know exactly why.  Based on the

24   evidence that we have as far as the termination, I believed

25   it appropriate and I believe she should have been terminated

1    Q        I'm not suggesting you should know.  I just
2   wonder if you know.
3    A        I would hope it would be removed.
4    Q        Why would you hope it would be removed?
5    A        Well, if we made a decision to remove that,
6   that there was conflicting evidence, then I would make it so
7   it never showed up.  I would not want it to be a part of
8   her --
9    Q        In other words, to be fair?
10   A        Yes.
11   Q        See, what prompted my response was that the
12   AWOL, I thought you said, and I probably misunderstood you,
13   that the AWOL had been taken away but the pay was given back.
14   Did I misunderstand you?
15   A        I hope I'm understanding the human resource
16   terms is that we remove the absent without leave designation
17   for that eight-hour period.
18   Q        Which would require you to give her the eight
19   dollars -- or the eight hours back.
20   A        Eight hours of pay.  Yes.
21   Q        Probably eight dollars, too.
22   A        A little more than that.
23   Q        I'm just teasing.  All right.  Well, is there
24   any other major disciplinary issues that you remember with
25   Sammi Wright -- we have the AWOL -- that stick out in your

1  mind as something that she did which would constitute

2  progressive discipline?  In fairness to you, I think you have

3  alluded to refusal to answer, either refusal, failure to

4  answer pages?  Anything having to do with automobiles, sir?

5      A        Yes.  Improper use of vehicles.

6      Q        What did she do wrong there?

7      A        I believe she was taking the vehicles home,

8  which is against VA policy.

9      Q        Did anybody else do that?

10      A        Not that I'm aware of.

11      Q        That you knew of.

12      A        No, not that I'm aware of.

13      Q        Did the people that worked at an equal station

14  with her do that kind of thing?

15      A        Take it home, you mean, take the vehicle home?

16      Q        Sure.

17      A        Not that I'm aware of.  My understanding is it

18  requires a memo, and I can't remember the exact wording of

19  it, either from the director or from a higher authority than

20  myself to get approval to take a vehicle to your personal

21  residence.

22      Q        Was her conduct ever investigated?  By that I

23  mean, you know, was there an effort made to sit down, codify,

24  check on, and put some factual information together about her

25  alleged misconduct?

1    A       Yes.  This is the -- this is going back to
2    March, and there was a memo to all residential care social
3    workers outlining appropriate conduct.  There was a memo in
4    June to the residential care social workers outlining
5    appropriate conduct, and then there were multiple verbal
6    meetings as well as letters of disciplinary action
7    identifying the deficiencies through that entire year up till
8    the termination.
9    Q       Yes, you testified very well to those memos
10   and things, but I'm talking about the things or situations
11   where Sammi Wright did not comply.  Did you call and check a
12   residential home, check with veterans, check with telephone
13   operators or people in the motor pool, whatever?  I mean, you
14   know --
15   A       I'm not sure how I didn't answer that already.
16   I'm sorry, I must not be understanding.
17   Q       Well, she has alleged -- here's where I'm
18   coming from, let me try to clarify it for you.  I apologize
19   for my inadequacies here.  Sammi Wright alleges that she
20   called -- or that the operators, the people that operate the
21   telephones or whatnot had received calls from people who
22   Sammi believes was Beulah Hadrick in most cases and in some
23   cases was Lola Bell Scott.  I don't think she mentioned your
24   having done anything of this sort, but gathering information
25   about her, where she goes, what she does, et cetera, that

1  kind of thing.

2      A      I'm not aware of those investigations.

3      Q      Well, if there was such an investigation, are

4  you allowed to do those kind of things without telling an

5  employee or are you allowed to just check on them as you want

6  to as a matter of supervisory prerogative?

7      A      Well, I would hope that a supervisor would be

8  allowed to check on the location of an employee that reports

9  to them.

10     Q      Sure.  And would you do that on like, do you

11 have any SOP governing the way you do those things?

12     A      Not that I'm aware of.

13     Q      Have you ever had a case where an

14 investigation is used to throw a cloud over somebody?

15     A      I've never -- no, not that I'm aware of.

16     Q      If investigators did something like that in

17 order to try to make a person appear a certain way for

18 political or personal or employment types of reasons, would

19 that be improper?

20     A      For -- you said for personal reasons?  I

21 definitely agree it would be improper.

22     Q      For reasons other than work performance.  For

23 personal, political, retaliatory reasons, because where I'm

24 going with this --

25     A      I believe that would be inappropriate.

33

 1    Q        Okay.  Because Sammi Wright is alleging that

 2   she was treated this way and investigated, and she claims

 3   it's harassment, because she was complaining about the

 4   reorganization that occurred in early 2000 and that she was

 5   picked on for that reason.

 6            So to give you an opportunity to respond to

 7   her allegation, do you think there is any basis whatsoever

 8   for Sammi Wright to allege that she was mistreated because

 9   she wrote to Senator Specter or complained internally or

10   filed complaints?

11    A        None.  None whatsoever.  If she had done her

12   daily job, there wouldn't be any issue at all.

13    Q        Do you know why the VA settled with her on the

14   administrative claims that she personally handled?

15    A        No, I have...

16    Q        Do you know what the basis of the settlement

17   was?  In other words, do you know whether the VA settled with

18   her because they violated her rights procedurally?

19    A        No.

20    Q        Do you know what that means, procedurally as

21   opposed to substantively in a --

22    A        Not exactly, no.

23    Q        Lawyers deal more with those kind of terms, I

24   guess.  You know, you've alleged things that Sammi Wright did

25   wrong, okay.  The VA settled with her about her employment

45

1   was at least two.  I'd have to go back and check the minutes

2   to see how many she was there.

3        Q        Did that anger you or upset you at all?

4        A        No.  It just made it uncomfortable to interact

5   with employees in kind of a casual way.

6        Q        Was that an act of belligerence?

7        A        I don't know that I'd use that strong of a

8   term for that.

9        Q        What did she do that was belligerent?  You

10  used the word "belligerent" earlier on to describe her

11  conduct, and I've tried to listen to you very, very closely

12  and I'm looking for the conduct that was belligerent.  Can

13  you tell --

14       A        Refusing a direct order from a supervisor is

15  belligerence to me.

16       Q        Okay, that's belligerent.  And do you remember

17  what the direct order was, is it this reporting thing that

18  you were telling us about?

19       A        Reporting, yes.

20       Q        Any other belligerent acts aside from refusing

21  to follow or respond to the direct order to report her daily

22  schedule and activities?

23       A        Depending on how you define the belligerence,

24  but I think the not answering pages, improper use of a

25  government vehicle, screaming at your supervisor, telling

82

```
 1      STATE OF PENNSYLVANIA    :
                                 : ss
 2      COUNTY OF DAUPHIN        :

 3              I, Sherry Bryant, a Reporter Notary-Public,

 4      authorized to administer oaths within and for the

 5      Commonwealth of Pennsylvania and take depositions in the

 6      trial of causes, do hereby certify that the foregoing is the

 7      testimony of SCOTT T. SHREVE.

 8              I further certify that before the taking of

 9      said deposition, the witness was duly sworn; that the

10      questions and answers were taken down stenographically by the

11      said reporter Sherry Bryant, a Reporter Notary-Public,

12      approved and agreed to, and afterwards reduced to typewriting

13      under the direction of the said Reporter.

14              I further certify that the proceedings and

15      evidence contained fully and accurately in the notes by me on

16      the within deposition, and that this copy is a correct

17      transcript of the same.

18              In testimony whereof, I have hereunto

19      subscribed my hand this 20th day of September 2002.

20

21

22                          Sherry Bryant, RMR, CRR

23      My commission expires:
        December 13, 2005

24

25
```